Chris **DEMETRIADES** and Demetriades Developers, Inc., Plaintiffs,

v.

Nicholas **KAUFMANN**, Cheryl Kaufmann, Judy Koch, Dudley D. Doernberg Company, Inc., Gino Gallo and John Gallo d/b/a Gallo Brothers, and MCR Consulting Engineers, Defendants.

No. 88 Civ. 0848 (GLG).

United States District Court,
S.D. New York.

March 8, 1988.

Milgrim Thomajan & Lee, P.C., New York City (Steven M. Hartman and William M. Hart, of counsel), and Shuman & Wood–Smith, White Plains, N.Y. (Jeffrey A. Shuman and Lelia M. Wood–Smith, of counsel), for plaintiffs.

McAulay, Fields, Fisher, Goldstein & Nissen, New York City (Martin E. Gold-stein, of counsel), for defendants Nicholas and Cheryl Kaufmann, Gino and John Gallo d/b/a Gallo Brothers, and MCR Consulting Engineers.

Brumbaugh, Graves, Donohue & Raymond, New York City (Brendan J. O'Rourke, of counsel), for defendants Judy Koch and Dudley D. Doernberg Co., Inc.

## OPINION

GOETTEL, District Judge:

Certain of the defendants in this case have admitted to the unauthorized copying of plaintiffs' architectural plans, which have been granted a Federal copyright. There is little doubt that such acts constitute copyright infringement. The more difficult and novel inquiry presented by this case is whether construction of a residential home, designed primarily from the infringing copies of plaintiffs' plans, also violates either Federal copyright law or Federal or State law against unfair competition. These questions appear to be matters of first impression for this circuit, and their answers turn on subtle but important distinctions in the laws protecting creative ideas and their expression. It may appear to the casual observer that those distinctions operate arbitrarily in the case at bar; but our decision today is guided by application of legal doctrine that, for good reason, has remained virtually unchanged for well over a century.

We have before us plaintiffs' motion for preliminary injunctive relief. For the reasons that follow, we grant certain of the relief requested, but deny the gravamen of plaintiffs' motion—preliminary relief enjoining the further construction of the allegedly infringing home.

## I. FACTS

The following constitutes the court's findings of fact for purposes of the instant motion.

Plaintiff Chris Demetriades is president of Demetriades Developers Inc. ("DDI"), the corporate plaintiff in this action. DDI is a real estate developer engaged in the

building of luxury homes selling in excess of $1 million. Plaintiffs contend that each home built by DDI is distinct and unique, and that DDI's reputation and ability to sell such high-priced homes is predicated in part on this ability to deliver a unique product to wealthy, prospective homeowners. As proof of that assertion, plaintiffs note that DDI has built approximately forty homes over the last three years, and that no two homes it has constructed are the same.

In 1985, DDI retained Nadler Philopena and Associates to design plans for construction of a home on a lot at 12A Cooper Road in Scarsdale, New York (the "Demetriades house"). Those plans were approved by the Scarsdale Architectural Review Board, and eventually were filed with the Scarsdale Building Department as required by law. Construction on the home was completed in late 1986; the home was shown to the public at an open house in January of 1987; and DDI accepted a bid of over $2 million for the home one week after the showing.[1]

We note at the outset that the court has viewed pictures of the Demetriades house. We draw no conclusions as to the quality of the structure, but the visual appearance of the home is hardly remarkable, as plaintiffs intimate. Although the particular combination of certain features may arguably be unique, the home's design does not appear to be radically innovative or anything akin to a signal breakthrough in residential design.

At some point in 1987, defendants Nicholas and Cheryl Kaufmann learned that defendant Gallo Brothers, a Scarsdale real estate developer, owned a lot at 24 Cooper Road in Scarsdale. The Kaufmanns, who had earlier seen and expressed interest in the Demetriades house, contracted with Gallo Brothers in October of 1987 for construction of a home at the lot on 24 Cooper Road (the "Kaufmann house"). Their agreement provided that the Kaufmann house was to be of "substantially identical design" to the Demetriades house at 12A Cooper Road.[2]

The defendants concede that they came into unauthorized possession of the plans used by DDI for construction of the Demetriades house. It also appears that defendant MCR Consulting Engineers, retained by Gallo Brothers to prepare the design plans for the Kaufmann house, simply *traced* the copy of the DDI plans it was provided. The copies (with certain modifications) were ultimately filed by Gallo Brothers with the Scarsdale Building Department. It is further conceded that the DDI plans bore a designation which may qualify as notice of common-law copyright. Despite this, at no time did defendants seek plaintiffs' authorization to use or copy the DDI plans which served as the basis for the Demetriades house.

At some point in late 1987, plaintiff Demetriades became aware that the frame of the Kaufmann house suggested a design strikingly similar to the house DDI had built at 12A Cooper Road. That realization set in motion a chain of events. First, by agreement dated January 21, 1988, Nadler Philopena and Associates assigned to plaintiffs all right, title, and interest it had in the architectural drawings used for construction of the Demetriades house at 12A Cooper Road. Second, and now armed with that assignment, plaintiffs mailed to the Federal Copyright Office on February 2 an application for copyright registration of the plans in question. Third, and after making that mailing, plaintiffs initiated this action on February 8 seeking, *inter alia*, prelimi-

---

**1.** The purchasers and current residents of the Demetriades house are not parties to this action. The papers on the instant motion refer throughout to "the Demetriades house at 12A Cooper Road," and we retain that designation in the interests of consistency.

**2.** Just why a family that could afford a $2 million home would contract for a design substantially similar to the design of a home on the very same street is, to the say the least, a bit

puzzling. The circumstance may be explained, in part, by virtue of the fact that the Demetriades house apparently cannot be seen from the street. Consequently, the resale and psychic value of the Kaufmann house, which we understand can be seen from the street, probably will be unaffected. We doubt the same can be said of the Demetriades house now that a visible imitation is under construction.

nary and permanent injunctive relief enjoining the defendants from further relying on copies of the Demetriades plans and from further construction of the Kaufmann house. At this point in time, the foundation and frame of the Kaufmann house are completed.

Federal jurisdiction is premised on alleged violations of 17 U.S.C. § 501(a) (1982) (copyright infringement) and section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1982) (unfair competition for trade dress infringement). The trade dress claim is realleged as pendent state claims in the form of common law causes of action for unfair competition and tortious misappropriation, as well as under N.Y. Gen. Bus. Law §§ 349–50 (McKinney 1968 & Supp. 1988) (prohibiting deceptive commercial practices and advertising) and N.Y. Gen. Bus. Law § 368–d (McKinney 1984) (protecting dilution of trademark). On February 8, we denied plaintiffs' request for a temporary restraining order (in part because copying was at that time denied), and we now have before us plaintiffs' motion for a preliminary injunction. For the reasons that follow, that provisional remedy is granted in part and denied in part.

## II. DISCUSSION

The standard for granting preliminary injunctive relief in this circuit is well settled. Plaintiffs must show "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (per curiam). Guided by the *Jackson Dairy* standard, we consider the individual claims.

### *(a) The Federal Copyright Claim*

■ An action for Federal copyright infringement does not lie "until registration of the copyright claim has been made in accordance with [Federal copyright law] ... [or] registration has been refused...." 17 U.S.C. § 411(a) (1982). Receipt of an actual certificate of registration or denial of same is a jurisdictional requirement, and this court cannot prejudge the determination to be made by the Copyright Office. *Wales Indus. Inc. v. Hasbro Bradley, Inc.*, 612 F.Supp. 510, 515 (S.D.N.Y.1985) (Weinfeld, J.); *International Trade Management, Inc. v. United States*, 553 F.Supp. 402, 403, 1 Cl.Ct. 39 (1982). The rationale for this requirement is consistent with the obligations of the Copyright Office to determine in the first instance the validity of a copyright request.

In the case at bar, plaintiffs only mailed their application for copyright protection to the Copyright Office on February 2. When this action was instituted (February 8), a certificate of registration had not yet issued. Consequently, this court had no jurisdiction over the copyright claim. A valid certificate, however, has since been issued (No. VA 290–080, effective February 2, 1988).[3] On March 1 (after this motion was noticed), an amended complaint was filed properly setting forth this court's jurisdiction based on the issuance of the certificate. Accordingly, and in the interests of substantial justice, we treat this motion as deriving from a proper jurisdictional base.

■ To satisfy the elements of an infringement case, plaintiffs must prove (1) that they are the owners of a valid copyright and (2) that defendants engaged in the unauthorized reproduction of the copyrighted work. *Warner Bros., Inc. v. American Broadcasting Co.*, 654 F.2d 204, 207 (2d Cir.1981). As to the first prong, a certificate of registration generally serves as prima facie evidence of a valid Federal copyright. 17 U.S.C. § 410(c) (1982). This principle adheres even though, as in the case at bar, an assignee is the first to register the claim. *Sygma Photo News, Inc. v. High Society Magazine, Inc.*, 778 F.2d 89, 90 (2d Cir.1985). As to the second prong, this is the rare case of admitted

---

**3.** When an assignment of rights is involved, as here, there is a similar jurisdictional prerequisite regarding registration of that assignment. 17 U.S.C. § 205(d) (1982). A certificate recording the assignment was issued together with the certificate of copyright registration.

copying (albeit an admission of innocent copying only). Although certain modifications were made to the copied plans, there is no argument with the conclusion that the allegedly infringing copies are substantially similar to DDI's copyrighted plans. Further, even though most (if not all) of the copying in this case occurred before plaintiffs registered their plans for Federal copyright protection, a copyright owner may recover for infringements occurring prior to the issuance of a certificate. *Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 33 (2d Cir.1982); 3 M. Nimmer & D. Nimmer, Nimmer on Copyright § 12.08, at 12–59 (1987) [hereinafter "Nimmer"]. This court is satisfied, therefore, that plaintiffs are likely to prove the merits of their copyright claim.

■ Further, once the moving party has demonstrated a prima facie claim for copyright infringement, irreparable harm is presumed. *Hasbro Bradley, Inc. v. Sparkle Toys, Inc.*, 780 F.2d 189, 192 (2d Cir.1985). Accordingly, plaintiffs are entitled to preliminary relief under the *Jackson Dairy* standard.

It is in determining the extent of injunctive relief to which plaintiffs are entitled under Federal copyright law whereby this court must come to grips with an aspect of copyright law that presents formidable intellectual hurdles. A general overview of the distinctions between copyright and patent law will illuminate certain of the subtleties permeating our inquiry.

As a general proposition, original works of authorship fixed in a medium capable of reproduction are eligible for copyright protection. 17 U.S.C. § 102(a) (1982). If a copyright is awarded, it grants to its owner the exclusive right to prevent the unauthorized reproduction or copying of the copyrighted work. *Id.* at § 106. It is a fundamental maxim of copyright law, however, that a copyright protects "only the work's particular expression of an idea, not the idea itself." *Eden Toys, Inc. v. Marshall*

*Field & Co.*, 675 F.2d 498, 500 (2d Cir. 1982).[4] Thus, while copyright in a book describing events surrounding the Hindenburg disaster, *Who Destroyed the Hindenburg?*, entitles its author to prevent the unauthorized copying of that work by an infringer, that copyright does not vest in its owner an exclusive right to deny use of the ideas or themes embodied in the work. *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 978–79 (2d Cir.), *cert. denied*, 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980). Thus, no one could seriously argue that copyright in a work such as the above entitles the author to limit its use for classroom instruction, research, or pleasurable reading, nor could such a person prevent production of a movie or book based upon similar ideas or themes.

■ The protection of ideas, *per se*, must be found, if at all, within the confines of patent law. Patent law finds as its source the notion that certain ideas, based on their novelty, are deserving of protection so as to encourage innovation. *See* 35 U.S.C. § 102 (1982) (outlining requisites for patent protection). Patents may be provided, *inter alia*, to creators of novel inventions, *id.* at § 101, or designs. *Id.* at § 171. While a copyright confers on its owner an exclusive right to reproduce the original work, a patent provides its owner with the far broader right to exclusive use of the novel invention or design for a time-specific period. *Id.* at § 154. As one might imagine, the requisites for patent eligibility and review are more rigorous than the analogous provisions of copyright law. *See generally* 1 Nimmer, *supra*, at § 2.01[A] (distinguishing respective copyright and patent concepts of originality and novelty). With an appreciation for the very different nature of these rights—exclusivity to reproduction (copyright) versus exclusivity to use (patent)—we arrive at the substantive issue squarely presented by this case: given the fact that the principle utility of architectural plans is in their use, what is the breadth

---

**4.** The copyright law provides: "In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C. § 102(b) (1982).

of protection afforded such plans by a Federal copyright?

Plaintiffs concede that, even with copyrighted architectural plans, they do not possess a general right to prevent construction of a home imitative of the Demetriades design. They acknowledge that an individual may take photographs or draw sketches of the Demetriades house and, coupled with innate ability, seek to reproduce that structure.[5] They contend, however, that because defendants copied plaintiffs, architectural plans, construction of the Kaufmann house now constitutes copyright infringement and that construction may, therefore, be enjoined. We cannot agree.

■ Architectural plans, as drawings of a technical nature, are eligible for copyright protection.[6] Because such plans depict a "useful article," however, they "are subject to certain qualifications peculiar to this form of work." 1 Nimmer, *supra,* § 2.08[D][2][*a*], at 2–105. The contours of those limitations are shaped by the seminal case of *Baker v. Selden,* 101 U.S. (11 Otto) 99, 25 L.Ed. 841 (1879).[7]

At issue in *Baker* was the breadth of protection afforded by a copyright in a book outlining a unique book-keeping system. The book included explanatory material setting forth the nature of the system, as well as certain blank forms illustrating the system's application. The defendant created for use de facto duplicates of the forms illustrated in the book, and was sued for copyright infringement. The Court held that although copyright protection extends to the particular *explanation* of an art or work, it does not protect *use* of the art or work described by the copyrighted publication. *Id.* at 105. Thus, although plaintiff in that case could prevent the unauthorized reproduction of the copyrighted book in question, he could not prevent use of the teaching or useful article embodied in that work, the bookkeeping forms, without a patent. *Id.* at 104.

The Court's explanation/use dichotomy was framed with a broader appreciation for the very different natures of copyright and patent protection, discussed *supra.* We find the Court's language on this broader teaching to be particularly instructive for present purposes:

[N]o one would contend that the copyright of the treatise would give the exclusive right to the art or manufacture described therein. ... The novelty of the art or thing described or explained has nothing to do with the validity of the copyright. To give to the author of the book an exclusive property to the art described therein, when no examination of its novelty has ever been officially made, would be a surprise and a fraud upon the public. That is the province of letters-patent, not of copyright. The

5. Indeed, in addition to securing a copy of the DDI architectural plans, the Kaufmann defendants also took pictures of the Demetriades house, apparently going onto the construction site twice to obtain pictures of the interior.

6. Federal copyright law extends protection to "pictorial, graphic, and sculptural works." 17 U.S.C. § 102(a)(5) (1982). Included within that definition are "technical drawings, diagrams, and models." *Id.* at § 101. Consistent with explicit congressional intent, these sections have been interpreted to include architectural drawings. 1 Nimmer, *supra,* § 2.08[D][2][*a*], at 2–103 to 2–105.

7. A "useful article" is one defined as having "an intrinsic utilitarian function." 17 U.S.C. § 101 (1982). Such a definition necessarily includes living quarters. The copyright protection extended to a "useful article" depicted in a copyrighted work is limited by the following proviso:

This title does not afford, to the owner of a copyright in a work that portrays a useful article as such, any greater or lesser rights with respect to the making, distribution, or display of the useful article so portrayed than those afforded to such works under the law, whether title 17 or the common law or statutes of a State, in effect on December 31, 1977, as held applicable and construed by a court in an action brought under this title. *Id.* at § 113(b). Thus, the owner of a copyright in architectural plans has copyright protection in the useful article depicted in those plans (a house) only to the extent that such protection was recognized at law as of December 31, 1977, the day before the last major amendment to Federal copyright law took effect. The limits of that protection are set forth in *Baker* and its progeny. *See generally* 1 Nimmer, *supra,* at §§ 2.08[D][2] & 2.18 (discussing copyrightability of architectural plans and applicability of *Baker*).

claim to an invention or discovery of an art or manufacture must be subjected to the examination of the Patent Office before an exclusive right therein can be obtained; and it can only be secured by a patent from the government.

*Id.* at 102.

■ Thus, consistent with *Baker*, we find that although an owner of copyrighted architectural plans is granted the right to prevent the unauthorized copying of those plans, that individual, without benefit of a design patent, does not obtain a protectable interest in the useful article depicted by those plans. This is true even though the design concepts embodied in the plans "may never have been known or used before." *Id.* at 103. Further, the fact that architectural plans contain lines and figures rather than words is of no consequence since, as underscored by the *Baker* Court, "[t]hose illustrations are the mere language employed by the author to convey his ideas more clearly." *Id. See also id.* at 107 (suggesting that copyright in dressmaking patterns, if valid, does not extend to their use in dressmaking).

■ Accordingly, a preliminary injunction enjoining defendants in this case from continuing construction of the Kaufmann house, based solely on alleged infringement of copyrighted architectural plans, is inappropriate. We recognize that a preliminary injunction enjoining further construction issued in a similar case,[8] and that two other courts have suggested that such a remedy would have been appropriate under certain circumstances.[9] With all due respect to our learned colleagues on those courts, we do not believe, consistent with *Baker*, that such relief can obtain based solely on a violation of Federal copyright law.

More on point is this court's decision in *Muller v. Triborough Bridge Authority*, 43 F.Supp. 298 (S.D.N.Y.1942). In *Muller*, plaintiff was the owner of a Federal copyright in plans designing an approach to the Cross Bay Parkway Bridge. An approach similar in design ultimately was constructed by the defendant Authority, with no compensation provided to plaintiff. Much like the case at bar, it was alleged that the Authority misappropriated plaintiff's plans and infringed plaintiff's copyright. *Id.* Relying on *Baker*, the court concluded that "plaintiff's copyright of a drawing, showing a novel bridge approach to unsnarl traffic congestion, does not prevent any one from using and applying the system of traffic separation therein set forth." *Id.* at 300. We recognize that the *Muller* court found there to be no copying in that case, and that the question of injunctive relief was not specifically addressed. Our holding today, however, is a logical extension of *Muller* and its principled analysis of the *Baker* doctrine. Although plaintiffs may have a valid copyright in the architectural plans that served as the basis for the Dem-

---

**8.** *Herman Frankel Org., Inc. v. Wolfe,* 184 U.S.P.Q. (BNA) 189 (E.D.Mich.1974) (Joiner, J.).

Judge Joiner found liability for infringement of copyrighted architectural plans in an earlier, related case and, interestingly, our decision today is in accord with the letter of that earlier decision. In that case, Judge Joiner concluded that his finding of liability "protects against copying of copyrighted material, yet does not change the copyright act into a patent act and give the person holding the copyright a monopoly on the ideas there expressed." *Herman Frankel Org. v. Tegman,* 367 F.Supp. 1051, 1054 (E.D.Mich.1973). We agree with that conclusion, and our holding today protects plaintiffs' ability to recover damages for infringement of their copyrighted architectural plans. We also agree with Judge Joiner's earlier observation in *Tegman,* relating to *Baker* and its application, that a copyright owner should be able "to prevent another from copying copyrighted house-plans and using them to build the house." *Id.* at

1053. The injunctive relief we fashion today, discussed *infra,* will prevent defendants from further copying of plaintiffs' plans and from relying on any infringing copies of those plans. It is at that point, and only then, that we finally part company with Judge Joiner. *Wolfe* goes beyond the letter of *Tegman* and suggests that injunctive relief prohibiting architectural infringers from constructing a duplicate structure (an issue not addressed in *Tegman* ) also is an appropriate application of *Baker,* and to that conclusion we cannot subscribe.

**9.** *Ga–On Homes, Inc. v. Spitzer Homes, Inc.,* 178 U.S.P.Q. (BNA) 183 (M.D.Fla.1973), *aff'd mem.,* 492 F.2d 1241 (5th Cir.1974); *Nucor Corp. v. Tennessee Forging Steel Serv., Inc.,* 476 F.2d 386, 393 (8th Cir.1973). We note that the *Nucor* case, which involved infringement of plans for an industrial plant, concerned a common-law copyright.

etriades house, that protection simply does not extend to the design or the house itself absent a design patent. *See also Imperial Home Corp. v. Lamont,* 458 F.2d 895, 899 (5th Cir.1972) (holding *Baker* prevents individual from copying copyrighted architectural plans, but does not "clothe their author with the exclusive right to reproduce the dwelling pictured" or *"anywise restrict[ ]"* reproduction of an identical dwelling) (emphasis added); *DeSilva Constr. Corp. v. Herrald,* 213 F.Supp. 184, 195–96 (M.D.Fla.1962) (holding copyright protection limited *solely* to unauthorized copying or use of architectural plans but does not extend to structure itself).

It has been suggested that application of the *Baker* rule to cases such as the one at bar will produce harsh results. As Professor Nimmer rhetorically observed: "But are there some works [such as architectural plans] which by their very nature may be copied only for purposes of use and not for purposes of explanation, so that to deny liability by reason of copying is in effect even if not in theory to deny copyrightability to the work?" 1 Nimmer, *supra,* § 2.18[C][1], at 2–200. We might agree with Professor Nimmer were we to deny

liability altogether in this case, but such is not our holding today.

▇ We recognize that at least one court has suggested that a literal application of *Baker* would prevent an owner of copyright in architectural plans from prohibiting even the unauthorized copying of the plans themselves. *Scholz Homes, Inc. v. Maddox,* 379 F.2d 84, 85–86 (6th Cir.1967) (dictum). The *Scholz Homes* dictum, if adopted, would literally render plaintiffs' copyright in this case a nullity. Such a holding would subvert Congress's express and unequivocal intent to include architectural plans as proper subjects for copyright, discussed *supra* note 6. This court cannot countenance such a result when no constitutional challenge to Congress's determination is presented.[10] Consequently, we reject the *Scholz Homes* reading of *Baker* in this context, where the architectural plans themselves are the copyrighted work.[11] Instead, we hold that the unauthorized reproduction of copyrighted architectural plans constitutes infringement, and this court may enjoin such copying and ultimately award damages for that action consistent with 17 U.S.C. §§ 502–05

**10.** We do not intimate that such authority is in doubt. Congress has constitutional authority "[t]o promote the Progress of Science and the useful Arts, by securing for limited Times to Authors and Inventors the exclusive right to their respective Writings and Discoveries...." U.S. Const., art. I, § 8, cl. 8. Although Congress has wide latitude in determining the appropriate scope of coverage under this clause, *Goldstein v. California,* 412 U.S. 546, 561–62, 93 S.Ct. 2303, 2312, 37 L.Ed.2d 163, *reh'g denied,* 414 U.S. 883, 94 S.Ct. 27, 38 L.Ed.2d 131 (1973), that discretion is not without its limits. *See Baker,* 101 U.S. at 105, 106–07 (dicta) (citing with approval to earlier cases holding that stock market index in newspaper and scoring sheets for game of cricket are not proper subjects for copyright). Whether or not architects and their drawings qualify under either the authors/writings or inventors/discoveries category within the meaning of the above clause is an issue we do not reach. Consistent with our obligations, this court will not address constitutional questions that are not presented. *Mazer v. Stein,* 347 U.S. 201, 206 n. 5, 74 S.Ct. 460, 464 n. 5, 98 L.Ed. 630, *reh'g denied,* 347 U.S. 949, 74 S.Ct. 637, 98 L.Ed. 1096 (1954).

**11.** In *Baker,* the duplicate book-keeping forms created by defendant were not exact copies of

the forms illustrated in plaintiff's copyrighted book. The Court noted, however, that the duplicates were substantially similar and, therefore, that defendant would have been guilty of infringement if plaintiff's forms had been a proper subject of copyright. *Baker,* 101 U.S. at 100. Since the defendant was not found guilty of infringement, however, the *Scholz Homes* court reasoned that direct copying of copyrighted architectural plans might not constitute infringement under an extension of the *Baker* rationale. *See also American Inst. of Architects v. Fenichel,* 41 F.Supp. 146, 147 (S.D.N.Y.1941) (direct copying and use of contract forms in a copyrighted book not protected by copyright under rule of *Baker* ). A crucial factual distinction between *Baker* and the case at bar mandates a different conclusion. The book-keeping forms in *Baker* were part of a broader, copyrighted work and were not themselves copyrighted. Here, it is the architectural plans themselves, and nothing else, which bear a copyright. Congress must have intended that an architectural copyright mean something, and, absent a constitutional challenge to Congress's authority to provide copyright protection to architectural plans, we must give that intention force.

(1982).[12] *Cf. Continental Casualty Co. v. Beardsley*, 253 F.2d 702, 704 (2d Cir.), *cert. denied*, 358 U.S. 816, 79 S.Ct. 25, 3 L.Ed.2d 58 (1958) (suggesting that when explanation and use merge in single, copyrighted document, unauthorized copying of that document constitutes infringement).

In conclusion, we find that plaintiffs are likely to succeed on the merits of their copyright infringement claim and we presume irreparable harm. Consequently, plaintiffs are entitled to preliminary injunctive relief.

We have express statutory authority to fashion whatever preliminary relief may reasonably effectuate the purposes of Federal copyright law. 17 U.S.C. § 502 (1982). Consistent with our above analysis, defendants are enjoined from further, unauthorized copying of the architectural plans that served as the basis for the Demetriades house, and they are further enjoined from relying on any infringing copies of those plans. In addition, this court has authority in appropriate cases to impound allegedly infringing copies of a copyrighted work pending the final outcome of litigation. *Id.* at § 503. Given the admitted copying in this case (albeit an admission of innocent copying only), we think impoundment is an especially appropriate preliminary remedy. Accordingly, we also order the impoundment of all infringing copies of the DDI plans within the defendants' control.

■ We do not enjoin construction of the Kaufmann house based on alleged infringement of the DDI architectural plans. Whether or not the construction originally "flowed from" infringing copies of DDI's plans, as plaintiffs' counsel urged at oral argument, is immaterial. Construction of a building imitating that depicted in copyrighted architectural plans does not, consistent with *Baker*, constitute infringement of those plans. Although individuals are not free to make unauthorized copies of copyrighted architectural plans, they remain free to duplicate houses depicted in those plans unless and until the designs embodied in such plans are secured by patent.[13]

It is argued by plaintiffs that such relief may obtain by virtue of the additional Federal or pendent causes of action for trade dress infringement. Consequently, we now direct our attention to those claims.

### (b) The Trade Dress Claims

As with plaintiffs' copyright claim, we may presume irreparable harm if plaintiffs can establish a prima facie claim for trade dress infringement. *Paco Rabanne Parfums, S.A. v. Norco Enter., Inc.*, 680 F.2d 891, 893–94 (2d Cir.1982). Unlike the copyright claim, however, the merits of plaintiffs' trade dress claim are dubious, at best.

■ Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1982) ("section 43(a)") creates a sweeping federal analog to state laws against unfair competition. *LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 75 (2d Cir.1985). As such, and unlike Federal copyright law, a Federal certificate of trademark registration is not a jurisdictional prerequisite for a section 43(a) claim. *Warner Bros., Inc. v. Gay Toys, Inc.*, 658 F.2d 76, 77–78 (2d Cir.1981).

■ The unregistered trade dress, or packaging, of a product is "eligible for protection under § 43(a) if it is *nonfunctional* and has acquired a *secondary meaning* in the marketplace by which it is identified with its producer or source." *LeSportsac*, 754 F.2d at 75 (emphasis added). If the plaintiffs can establish a protected, unregistered trade dress based on nonfunctionality and secondary meaning, there must then be a showing that the allegedly infringing trade dress is likely to cause confusion in the market. *Id. See*

---

**12.** We hasten to emphasize that damages in this case may be substantial. Plaintiffs assert that their architectural fees for the Demetriades house were approximately $40,000. If a willful violation of the copyright laws is proven, damages may even exceed that amount, up to and including $50,000.

**13.** Of course, the effect of our ruling may be to shut down construction for a certain period of time, at least until new plans can be drawn up and submitted to the Scarsdale Architectural Review Board for consideration.

*also Polaroid Corp. v. Polarad Elec. Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961) (outlining factors to be considered in determining if confusion in market exists). On this motion for a preliminary injunction, plaintiffs need not prove the existence of an unregistered trade dress subject to Lanham Act protection. They must, however, make a showing sufficient to establish the likelihood of success on this claim (or, at a minimum, present sufficiently serious questions going to the merits). *Jackson Dairy*, 596 F.2d at 72. We find that plaintiffs have not met their burden under *Jackson Dairy*.

Plaintiffs' trade dress claim rests on a novel application of section 43(a). They correctly note "that the design of a product itself may function as its packaging, serving to distinguish it from other products, and hence be protectable trade dress under § 43(a)." *LeSportsac*, 754 F.2d at 75. Based on this holding, plaintiffs contend that the unique and distinctive design of DDI homes, as embodied in the Demetriades house at 12A Cooper Road, distinguishes DDI homes from other luxury homes. As such, these unique designs qualify as DDI's trade dress. We are referred to no case extending section 43(a) protection to residential development and, as will become obvious in our ensuing discussion, we are not persuaded at this time that plaintiffs are likely to justify such an extension in this case.[14]

As to functionality, the test in this circuit generally includes a determination as to whether the feature(s) in question "must be 'essential to the use or purpose of the article' or must affect 'the cost or quality of the article'...." *Id.* at 77 (citing *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 850 n. 10, 102 S.Ct. 2182, 2187 n. 10, 72 L.Ed.2d 606 (1982) (dictum)). *See also Warner Bros., Inc. v. Gay Toys, Inc.*, 724 F.2d 327, 331 (2d Cir. 1983) (elaborating on the *Inwood Laboratories* requirements).[15]

Holding as we do, *infra*, that plaintiffs are unlikely to demonstrate secondary meaning, and since that in itself is sufficient to undermine a section 43(a) claim for protection of an unregistered trade dress, we need not engage in an elaborate functional analysis. We have certain reservations, however, with the notion that a residential home can qualify as a nonfunctional good. A home, with its roof, siding, doors, windows, etc., is an inherently functional structure. Plaintiffs seek to avoid this conundrum by arguing that particular aspects of the Demetriades house are unique and are not needed for that home to "function." They argue that the *location* of the doors, windows, and fireplace, a distinctive octagonal turret, and a certain glass-enclosed area are all design features unnecessary to the home's "functioning" and which support the claim for trade dress protection.[16] To the extent that DDI is able to put its "signature" on a home by virtue of a unique, ornamental design that is unrelated to the "functioning" of the home, DDI may have a stronger argument for

**14.** We note, parenthetically, that section 43(a) extends protection to "goods and services." 15 U.S.C. § 1125(a) (1982). By our decision today, we make no holding as to whether a residential home qualifies as a "good" or "service" thought to be protectable by section 43(a). We are aware of no case so holding, and the issue was not raised or briefed by the parties on this motion.

**15.** The *LeSportsac* court also suggested that, under certain circumstances which it did not make clear, it may be appropriate to consider whether the feature(s) in question is "an important ingredient in the commercial success of the product [or the] ... saleability of the goods." *LeSportsac*, 754 F.2d at 77–78 (citing *Industria Arredamenti Fratelli Saporiti v. Charles Craig, Ltd.*, 725

F.2d 18, 19–20 (2d Cir.1984)). The court has since clarified that the *Craig* standard is no longer applicable in a functionality analysis. *Morex S.P.A. v. Design Inst. America, Inc.*, 779 F.2d 799, 801 (2d Cir.1985) (per curiam).

**16.** We recognize that functionality is a defense, and that the burden of proof on this issue, therefore, will rest with the defendants. *LeSportsac*, 754 F.2d at 76. On a motion for a preliminary injunction, however, our task is to consider the entire, existing factual record and make a preliminary determination on the likelihood of success. Non-functionality is one of the two prerequisites for unregistered trade dress protection, so the plaintiffs' rebuttal position on functionality is relevant.

trade dress infringement. The suggestion, however, that the mere location of doors. and windows, the location of which are not essential to the home's "functioning," can constitute a developer's trade dress would be an innovation in the law that we think portends broad ramifications for the home-building industry. The question, however, is moot since, with respect to secondary meaning, we find it highly unlikely that plaintiffs will be able to demonstrate the secondary meaning allegedly attaching to the Demetriades house.

The Second Circuit has held that "[t]he trade dress of a product has attained 'secondary meaning' when the purchasing public associates that dress with a single producer or source rather than with just the product itself." *LeSportsac*, 754 F.2d at 78 (citing *Inwood Laboratories*, 456 U.S. at 851 n. 11, 102 S.Ct. at 2187 n. 11 (dictum)). Put differently, when the unregistered mark stands out with the buying public as a "mark of distinction," section 43(a) protection is appropriate. *Blisscraft of Hollywood v. United Plastics Co.*, 294 F.2d 694, 697 (2d Cir.1961) (citing *Lucien Lelong v. Lander Co.*, 164 F.2d 395, 397 (2d Cir. 1947)). Based on the complaint, it is inconceivable to us how plaintiffs will demonstrate the secondary meaning of the Demetriades house at 12A Cooper Road.

The complaint is replete with references to the fact that plaintiffs have built a reputation for designing and constructing *"unique* and *distinctive"* homes. Complaint ¶¶ 22-25, 28-30, 35 (emphasis added). Moreover, plaintiff Demetriades, in his affidavit submitted in support of this motion, points with pride to the fact that "[e]ach home which DDI builds is unique *and no two homes are ever the same."* Demetriades Affidavit ¶ 4 (emphasis added). He notes further that DDI devotes substantial resources "for architectural fees in order to obtain a well designed and unique plan for a house, rather than one which may be obtained from stock plans." *Id.* Underscoring DDI's reputation as a builder of "distinct[,] one-of-a-kind homes," *id.* at ¶ 5, the Demetriades affidavit further adds: "My belief, philosophy and guaranty is that a purchaser who spends more than one

million ($1,000,000) dollars for one of my homes is entitled to a unique home. For this reason *I have never built the same house twice." Id.* at ¶ 4 (emphasis added).

The Demetriades affidavit additionally makes clear that the house at 12A Cooper Road was no exception to these standards, noting that the house "was promoted as 'a *one of kind* manor home'." *Id.* at ¶ 10 (emphasis in original).

It simply is untenable to suggest that the house at 12A Cooper Road is one of a kind and, in the same breath, argue that it has secondary meaning in the market and therefore qualifies as DDI's trade dress. Again, as noted *supra,* if DDI repeatedly affixes its "signature" to the homes it builds by virtue of a unique ornamental design or unique fixture (which is not alleged), then the trade dress claim might find firmer support. The claim, however, that the general uniqueness of DDI-designed homes is DDI's "mark of distinction" or trade dress is simply too amorphous.

Plaintiffs have submitted the affidavits of several area real estate brokers who have sold and are familiar with DDI-designed homes. Each speaks of the "unsurpassed reputation" Demetriades has for building distinctive homes of the highest quality. We do not quibble with this assertion. We must make a quantum leap from that proposition, however, to one that would serve as a valid basis for a trade dress claim; viz, that not only does DDI enjoy a reputation for quality, but that the home buying public could drive by a DDI home and identify it as such by virtue of its trade dress. A prospective purchaser of a DDI home is undoubtedly attracted to the home initially because of the home's unique and luxurious look. The sophisticated buyer may then find comfort in the fact that the home was built by DDI (assuming validity of DDI's assertion that it enjoys a reputation for building high-quality homes). Plaintiffs, in arguing that the house at 12A Cooper Road has secondary meaning, would have us believe that the thought processes of a prospective buyer run something like this: "Look at that unique home. It must be a DDI home because that

unique design looks like the other unique designs DDI has a reputation for creating." The illogic of that syllogism is manifest in its expression.

Plaintiffs argue further that defendants concede they copied the DDI plans (at least innocently, and with certain modifications), and that proof of copying is the most persuasive evidence of secondary meaning. *LeSportsac*, 754 F.2d at 78; *LeSportsac, Inc. v. Dockside Research, Inc.*, 478 F.Supp. 602, 608 (S.D.N.Y.1979). In a case involving commercial, mass-manufactured goods, evidence of copying may indeed constitute the most persuasive proof of secondary meaning. Applying that rationale to the business of residential development does not lead to the same conclusion. Evidence of copying in this case merely shows that the Kaufmanns admired the Demetriades house at 12A Cooper Road, and wanted to build their own house on a parallel or similar design. It does not demonstrate that the Demetriades house has achieved a secondary meaning in the homebuyer's market linking that particular design with the DDI name.[17]

The above analysis merely underscores the difficulties in extending Lanham Act protection, on the basis of a single, residential home, to the business of real estate development. We are aware of no case that has yet done so. In support of their proposition that an individual residence can serve as a developer's trade dress plaintiffs rely principally on *Fotomat Corp. v. Cochran*, 437 F.Supp. 1231 (D.Kan.1977). In that case, Judge Rogers held that the uniquely designed, blue Fotomat building, with its yellow, three-tiered roof, could constitute a valid service mark. *Id.* at 1241. That case is readily distinguishable.

First, and most importantly, Fotomat *had* a federally registered trademark in its building design. *Id.* at 1237. A certificate of trademark registration constitutes prima facie evidence of a valid trademark. 15 U.S.C. § 1057(b) (1982); *Hollister Inc. v. Downey*, 565 F.2d 1208, 1209–10 (C.C.P.A. 1977). Consequently, Judge Rogers did not need address whether a legitimate mark existed; he simply "presume[d] the validity of [Fotomat's] service mark." *Fotomat*, 437 F.Supp. at 1236. In the case at bar, the Demetriades house or its design is not a federally registered trademark, and to say we have doubts that the U.S. Patent and Trademark Office would issue such a certification is a modest understatement.

Second, Judge Rogers found that Fotomat used, to the maximum extent possible in the relevant geographic area, the same blue and yellow design for its buildings, *id.* at 1237, and that the infringing design by a Fotomat competitor caused confusion in the marketplace. *Id.* at 1240. In the case at bar, we have found that plaintiffs are unlikely to establish that their alleged mark has achieved a sufficient, secondary meaning in the marketplace. As such, it would not be an unregistered mark deserving of protection under section 43(a), and we need not address the question of possible confusion.[18] Unlike Fotomat, which consistently built its photo-processing drop-off stands on the same design, plaintiffs in this case cite with pride to the fact that each and every DDI-designed home is "unique and distinctive," and that no two DDI-designed homes are the same. Plaintiffs' reliance on *Fotomat*, therefore, is inapposite.[19]

In conclusion, we believe that extending section 43(a) protection to individual, resi-

---

**17.** Contrary to plaintiffs' assertions, the affidavits of area real estate brokers submitted in support of this motion reaffirm rather than contradict our conclusions. For example, one such affidavit, typical of the others, notes that "[the DDI] name is linked with quality and excellence." Prince Affidavit ¶ 5. That is a far cry from public linkage of the DDI name with a specific trade dress. Many manufacturers enjoy a reputation for quality, and, as we are constantly reminded, quality has been "job one" at the Ford Motor Company for some years now. Ford, with its arguably unique car designs, has no more a lock on quality as its trade dress than

does DDI with its arguably unique house designs. Simply put, quality, without more, does not a trade dress make.

**18.** The concepts, of course, are somewhat interrelated. It stands to reason that there can be no confusion in the market if a trade dress has not achieved a secondary meaning in that same market.

**19.** For similar reasons, we find inapplicable other cases holding that the unique architectural design of a company's outlets may constitute

dential designs would work a profound mischief in both the law and the home-building industry. If plaintiffs' trade dress claim finds support, then plaintiffs could prevent the replication of that trade dress by others and would achieve a de facto monopoly in DDI home designs under the guise of trade dress. They would achieve by indirection what they have not sought and may not qualify for by direction (a patent), and that is a result this court will not abide.

For all of these reasons, we find that plaintiffs have not demonstrated a likelihood of success on the merits of their Federal trade dress claim. On the contrary, this court doubts whether a prima facie section 43(a) claim is set forth in the complaint. Injunctive relief based on the section 43(a) claim, therefore, is unwarranted.

· The trade dress claim is realleged under the common law torts of unfair competition and misappropriation,[20] as well as under N.Y.Gen.Bus.Law. §§ 349 & 350 (McKinney 1968 & Supp.1988) (prohibiting deceptive commercial practices and advertising)[21] and N.Y.Gen.Bus.Law § 368–d (McKinney 1984) (protecting dilution of trademark). Plaintiffs contend that New York's unfair competition law is more generous than the Federal analog, section 43(a), in recognizing a claim for trade dress infringement. Whether or not that is so, plaintiffs must, at a minimum, demonstrate that the trade dress in question has achieved a mark of distinction in the buying public. See Sally Gee, Inc. v. Myra Hogan, Inc., 699 F.2d 621, 625 (2d Cir.1983) (discussing requirements of New York law for trade dress claim). For much the same reasons outlined above, we do not find it likely that plaintiffs will be able to prove their state claims for trade dress infringement, nor do we find serious questions going to the merits of these claims. Consequently, plaintiffs are not entitled to any form of injunctive relief on the basis of their trade dress claims.

### CONCLUSION

For all of the foregoing reasons, we find that plaintiffs are likely to succeed on the merits of their copyright claim and are, therefore, entitled to a preliminary injunction. Accordingly, based on our authority to effectuate the purposes of Federal copyright law, we hereby:

(1) enjoin defendants from further, unauthorized copying of the architectural plans that served as the basis for the Demetriades house;

(2) enjoin defendants from further relying on any infringing copies of said plans; and

(3) order the impoundment of all infringing copies of said plans within the defendants' control.

We also find that the plaintiffs are unlikely to establish the elements for a Federal or state claim for trade dress infringement, and no further injunctive relief, therefore, is warranted.

The parties will settle an order consistent with this opinion.

SO ORDERED.

Inc., 784 F.2d 44, 53 (2d Cir.), cert. denied, 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 721 (1986) (preempting state claim of unfair competition); Financial Information, Inc. v. Moody's Investors Serv., Inc., 808 F.2d 204, 208 (2d Cir.1986), cert. denied, —— U.S. ——, 108 S.Ct. 79, 98 L.Ed.2d 42 (1987) (preempting misappropriation claim).

**21.** This court has considerable doubt as to whether plaintiffs (a corporation and its president) may properly bring an action under these sections, which clearly are designed to provide consumers with a remedy against commercial fraud. Genesco Entertainment v. Koch, 593 F.Supp. 743, 751–52 (S.D.N.Y.1984).

that business's trade dress. See, e.g., White Tower System, Inc. v. White Castle System of Eating Houses Corp., 90 F.2d 67, 68 (6th Cir.), cert. denied, 302 U.S. 720, 58 S.Ct. 41, 82 L.Ed. 556 (1937) (hamburger chain whose stands were designed as miniature, white castles); Associated Hosts of California v. Moss, 207 U.S.P.Q. (BNA) 973 (W.D.N.C.1973) (restaurant chain whose restaurants were identical and distinctive in design).

**20.** If we misread these claims and the unauthorized copying of the architectural plans serves as their foundation, they are preempted by the Federal copyright claim pursuant to 17 U.S.C. § 301(a) (1982). See Walker v. Time Life Films,