Linda D. EALES and Eales & Associates, Inc., Plaintiffs–Appellees,

v.

ENVIRONMENTAL LIFESTYLES, INC., an Arizona Corporation; Michael Shotey; et al., Defendants–Appellants.

No. 90–16455.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 7, 1991.

Decided March 5, 1992.

As Amended May 11, 1992.

Leighton P. Clark, Phoenix, Ariz., for defendants-appellants.

John L. Dillingham, Dillingham, Keilp & Cross, Phoenix, Ariz., for plaintiffs-appellees.

Before POOLE, REINHARDT and FERNANDEZ, Circuit Judges.

POOLE, Circuit Judge:

Environmental Lifestyles, an Arizona real estate developer, and its officer Michael Shotey appeal a judgment in favor of the plaintiff, an architect, in this copyright infringement case. The defendants contend that the plaintiffs' architectural plans were not entitled to copyright protection and that, even if they were, the district court miscalculated actual damages and improperly awarded the plaintiffs lost profits. We affirm.

## FACTS AND PROCEEDINGS

Wen–Clay, a homebuilder and real estate developer, hired the California architectural firm of Corbin, Yamafuji and Associates (CY) to prepare construction plans and drawings for model homes and homes for resale, both to be built at a development called "The Greens" near the Gainey Ranch area of Scottsdale, Arizona. After CY prepared a set of plans, Wen–Clay obtained a building permit for the construction of the homes from the Scottsdale government. CY's plans, however, were designed for construction of homes in California: the plans included features that would make the homes more likely to withstand earthquakes, and there were other indicators that CY did not draw the plans with the idea of building in Arizona in mind. Accordingly, a Wen–Clay executive contacted plaintiff Linda Eales, an architect and designer, and inquired about adapting the plans for use in Arizona. Wen–Clay was concerned that the plans would entail excessively high building costs and wanted to be sure that the plans conformed to the Scottsdale building code.

Eales, who during this time operated as both a sole proprietor and then in the corporate form as Eales & Associates, Inc., inspected the Greens building site with representatives of Wen–Clay. Model homes had been started on the site, but only one had partially constructed walls and none had been constructed beyond slabs and footings. After concluding that the CY plans were not compatible with Wen–Clay's desire to construct homes compatible with the Arizona climate and its own architectural style preferences, Eales reported that the plans would have to be changed. Wen–Clay accordingly stopped construction on the model homes so that it could review the

plans. Shortly thereafter, Wen–Clay retained Eales to prepare construction drawings for all of the model homes at the Greens.

Eales specifically retained ownership in the construction drawings when she agreed to prepare them for Wen–Clay's use and agreed with Wen–Clay in the contract that the plans could not be assigned without her permission. However, she did not seek the permission of CY to use its plans in constructing the homes at the Greens site. Instead, Eales returned the CY drawings to Wen–Clay and prepared her own construction drawings based upon a temporary Wen–Clay construction brochure and the necessity for creating plans compatible with the existing "footprints" of the then-existing models, including slabs, footings, elevator shafts, location of rooms and garages, and plumbing systems.

After completing these revised plans, Eales submitted them to the City of Scottsdale for a building permit. The city concluded that they differed sufficiently from the CY plan to require a full, on-site plan check. The city eventually issued the required building permit for the Greens development. During the fall of 1986, however, Wen–Clay's financial problems induced it to halt construction of the Greens development.

In May or June 1986, Donald and Anne MacKenzie bought lot 156 at the Greens development and decided several months later that they desired plan #3 to be built upon the site. Mr. MacKenzie had been negotiating with defendant Shotey for the construction of a pool on the property and discovered in November 1986 that Shotey had a contractor's license. Shotey had never before constructed a home. Shotey's company, defendant Environmental Lifestyles, Inc., was engaged in pool construction and landscape construction work at the Greens. Nevertheless, MacKenzie began discussing with Shotey the possibility that

Shotey would build the home since Wen–Clay was no longer in business.[1] On January 26, 1987, MacKenzie and Shotey agreed that Shotey would build a house conforming to plan #3 on lot 156.

Dennis Legere, a construction supervisor in Wen–Clay's employ for several years, was familiar with Eales' construction drawings. He had built several homes based upon such plans in the past and had used them regularly in building the model homes at the Greens development. He also knew that the CY plans, which he had seen, were not sufficient to construct any of the models. Legere contracted with Shotey and Environmental Lifestyles to become construction superintendent on the MacKenzie project on lot 156 in February 1987. Construction was completed in August of that year.

Neither Wen–Clay, Environmental Lifestyles, Shotey, Legere or MacKenzie ever contacted Eales to ask for permission to use her plans in constructing the MacKenzie home. Eales discovered that her plans were being used in the construction at lot 156 after hearing Shotey describe the home and confronting Legere at the construction site. Shotey, Environmental Lifestyles, and Legere, however, all knew that Eales' plans for model #3 were being used to build a home on lot 156. In fact, Legere sent a letter to the Scottsdale building department informing them that Wen–Clay had given Environmental Lifestyles permission to use plan #3 in building the lot 156 house. Eales' plans for model #3 had been machine copied by Environmental Lifestyles vice-president Kurt Dobson, Shotey, or Legere, but the title block (a margin space on the plan drawings indentifying the architect) had been removed.

On April 28, 1987 Eales wrote to Shotey, Environmental Lifestyles, Legere and Mr. MacKenzie's company, Mac–West Investments, Inc. informing them that the plans

---

1. Defendant Michael Shotey contends that he sought repayment of money owed him by Wen–Clay, and that to settle this debt he agreed orally with Wen–Clay executive Roy Wensel to accept the Eales plans for model #3 at the Greens site as full satisfaction. However, the district judge concluded that "there is a serious question whether any such agreement ever existed" and that Shotey "had no reason to need [the Eales construction] plan" at the time he allegedly settled the Wen–Clay debt in this manner.

were being used without her permission and demanding her usual fee of $4.00 per square foot for a custom home together with an invoice for $11,968.00, which would be the resulting fee for the 2,992–foot MacKenzie home. None of the recipients of the letter responded to it.

On November 6, 1987 Eales' copyright registration for the plan # 3 construction drawings became effective. Eales had never publicly distributed her plan # 3 working drawings and took all necessary steps to inform Environmental Lifestyles, Shotey, Mac–West, and Legere of her ownership interest in the plans. The CY plans which had initially been commissioned by Wen–Clay for use at the Greens development were apparently never copyrighted. Shotey, Environmental Lifestyles and Legere all were aware of Eales' copyright claim on the plan # 3 drawings before they commenced construction on the MacKenzie home.

MacKenzie paid $201,750 for the home on lot 156. The cost of constructing the home was $141,000 and Legere was paid $12,500 plus 60% of the difference between $146,-000 and the actual cost of the home if under that figure, or $3,000, for a total of $15,500. Legere's fee was not included in the cost of constructing the home; accordingly, the total cost of the residence was $156,500. Environmental Lifestyles and Shotey thus earned $45,250 profit on the construction of the MacKenzie home.

Eales sued Environmental Lifestyles, Shotey, Legere, and MacKenzie for copyright infringement on April 28, 1988. She sought compensatory and punitive damages and an injunction restraining further infringement. On August 17, 1990, the district court for the District of Arizona, after a bench trial, entered judgment in favor of Eales and awarded her actual damages of $11,968 and profits of $45,250, for a total sum of $57,218. The court held that Legere was entitled to indemnification from Environmental Lifestyles and Shotey for $11,968 in damages and ruled that MacKenzie was not liable for any damages suffered by Eales. Shotey and Environmental Lifestyles timely appealed.

## STANDARD OF REVIEW

The factual findings that underlie the district judge's conclusions of law are reviewed for clear error. *McCullough v. Albert E. Price, Inc.*, 823 F.2d 316, 318 (9th Cir.1987). The district court's calculation of damages is also subject to clear error review. *Abend v. MCA, Inc.*, 863 F.2d 1465, 1480 (9th Cir.1988), *aff'd*, 495 U.S. 207, 110 S.Ct. 1750, 109 L.Ed.2d 184 (1990). This court has jurisdiction pursuant to 28 U.S.C. § 1291.

## DISCUSSION

Defendants Shotey and Environmental Lifestyles contend that the district court improperly found copyright protection for Eales' construction plans. They assert as grounds for this assertion that Eales' plans lack originality, are an unprotectable idea, and constituted an unlawful derivation of a pre-existing work. None of these arguments are meritorious. Shotey and Environmental Lifestyles also contend that the district judge incorrectly calculated damages. This contention is also without foundation.

### I. Validity of Eales' Copyright

#### A. Originality

In order to properly receive copyright protection, Eales' drawings must be original. *United States v. Hamilton*, 583 F.2d 448, 450 and n. 2 (9th Cir.1978). Defendants argue that this requirement is not met because Eales' plans fit under the copyright code's "useful article" exception and do not substantially differ from the earlier drawings prepared by CY. Both of these arguments are meritless.

The "useful article" exception of the copyright code would prevent Eales from copyrighting her plans if they "hav[e] an intrinsic utilitarian function that [does] not merely ... portray the appearance of the article or ... convey information." 17 U.S.C. § 101; *see Mazer v. Stein*, 347 U.S. 201, 218, 74 S.Ct. 460, 471, 98 L.Ed. 630 (1954). The intrinsic function of an architectural plan is to convey the information

necessary to enable the reader to construct a building. It is settled law that architectural drawings and plans are thus eligible for protection under the copyright code as "pictorial, graphic, [or] sculptural works." 17 U.S.C. §§ 101, 102(a)(5); *see, e.g., Robert R. Jones Assoc. v. Nino Homes,* 858 F.2d 274 (6th Cir.1988); *Imperial Homes Corp. v. Lamont,* 458 F.2d 895 (5th Cir.1972); *Demetriades v. Kaufman,* 680 F.Supp. 658 (S.D.N.Y.1988). Eales' plans are no exception to this general rule.[2]

■■■ Defendants' assertion that Eales' plans do not qualify for copyright protection because they are "substantially similar" to the drawings prepared by CY is also unpersuasive. The originality requirement does not demand that the author add "novelty" to the work; it requires only that the plans "display something irreducible, which is one man's alone, not that the work be novel in comparison with the works of others." *Hamilton,* 583 F.2d at 451 (quoting *Bleistein v. Donaldson Lithographing Co.,* 188 U.S. 239, 250, 23 S.Ct. 298, 300, 47 L.Ed. 460 (1903)). The originality requirement is met when the work is the result of independent creation. *Sid & Marty Krofft Television, Inc. v. McDonalds Corp.,* 562 F.2d 1157, 1162 (9th Cir.1977). The district court determined that Eales did not copy the CY drawings and that she created the plans for the model home without consulting those drawings. That determination was not clearly erroneous.

B. The "Idea–Expression" Distinction

■■■ Defendants next argue that Eales' plans do not qualify for copyright protection because they are an unprotectable idea. This argument is also meritless. While the copyright statutes do not allow an author to obtain a monopoly on an idea itself, an *expression* of an idea can be protected. *See Baker v. Selden,* 101 U.S. (11 Otto.) 99, 25 L.Ed. 841 (1879). Eales'

plans laid out the location and sizes of numerous features of model home # 3, and thus her ideas were "fixed" in tangible form. That is all the copyright code requires. *See* 17 U.S.C. § 102(a); *Kern River Gas Transmission Co. v. Coastal Corp.,* 899 F.2d 1458, 1463 (5th Cir.1990) ("[P]rotection is extended to an expression of an idea fixed in tangible form, but not to the idea itself regardless of the form in which it is fixed."). Eales won damages because defendants copied the plans she drew, not the idea she created.

II. Damages

Defendants argue that the district judge improperly calculated the damages and profits awarded Eales. This contention lacks merit. The copyright code allows the award of compensatory damages and infringer's profits. 17 U.S.C. § 504(b); *Frank Music Corp. v. Metro–Goldwyn–Mayer, Inc.,* 772 F.2d 505, 512 n. 5 (9th Cir.1985) (*Frank I*).

■■■ Eales is entitled to the lost fair market value of the architectural plans. *See Frank I,* 772 F.2d at 512; *Nucor Corp. v. Tennessee Forging Steel Service, Inc.,* 513 F.2d 151, 153 n. 3 (8th Cir.1975). In calculating this figure, the court is to determine "what a willing buyer would have been reasonably required to pay a willing seller for plaintiff's work." *Frank I,* 772 F.2d at 512. The district court properly applied this test, and substantial evidence supported the finding that Eales could have earned $11,968 by selling the plans. Defendants offer no evidence sufficient to cast doubt on this figure.[3]

■■■ Eales is also entitled to all profits attributable to the defendants' infringement of her copyright and to any ascertainable indirect profits. *Frank Music Corp. v. Metro–Goldwyn–Mayer, Inc.,* 886 F.2d

---

**2.** Because this case involves a claim of infringement of copyrighted plans, not a structure, the Architectural Works Copyright Protection Act of 1990, Pub.L. No. 101–650, 104 Stat. 5089 Title VII is inapplicable. *See* 1 *Nimmer on Copyright* § 2.08[D][2], at 2. 114 n. 163.4 ("The Architectural Works Protection Act … does not affect protection for architectural plans, drawings and

models as pictorial, graphic, or sculptural works.").

**3.** Specifically, Shotey and Environmental Lifestyles have not demonstrated that Eales' ordinary fee was not $4 per square foot or that the size of the finished MacKenzie home was not 2,992 square feet.

 

1545, 1550 (9th Cir.1989), *cert. denied,* 494 U.S. 1017, 110 S.Ct. 1321, 108 L.Ed.2d 496 (1990) (*Frank II*); *Transgo, Inc. v. Ajac Transmission Parts Corp.,* 768 F.2d 1001, 1023 (9th Cir.1985). In calculating the direct profits resulting from the defendants' infringing use of Eales' plans, the district judge correctly used as a measure the amount of profits Eales would have made on the house if she had sold it herself.[4] *See Russell v. Price,* 612 F.2d 1123, 1123 (9th Cir.1979) ("It is clear from a reading of the statute that the infringer's profits to which the copyright proprietor may be entitled consist of the ... sale *profits from the infringing use of the plaintiff's work....*") (emphasis added); *Robert R. Jones Assoc. v. Nino Homes,* 858 F.2d 274, 281 (6th Cir.1988); *see also, e.g., Aitken, Hazen et al. v. Empire Constr. Co.,* 542 F.Supp. 252, 262-63 (D.Neb.1982) (awarding revenues lost when developer illegally copied architectural plans and profits earned when infringer used them to build an apartment complex).[5]

■■■ While the district judge's findings of fact do not indicate the basis for its conclusion as to the costs of constructing the home, it is the defendants' burden to prove up their deductible costs. *Transgo,* 768 F.2d at 1024. Any doubt as to the correctness of the profit calculation should therefore be resolved in favor of the plaintiff. *See Stevens Linen Assoc. v. Mastercraft Corp.,* 656 F.2d 11, 14 (2d Cir.1981).[6]

**4.** 17 U.S.C. § 504(b) allows a copyright plaintiff to recover its actual damages and the profits earned as a result of an infringing use to the extent that they are "not taken into account in computing actual damages." This provision, which is designed to prevent a plaintiff from recovering twice for the same damages, bars a plaintiff from recovering in the form of damages the profits it could have made from selling the infringing item in competition with the infringer and the profits gained by the infringer from its use of the copyrighted item. *See, e.g., Abeshouse v. Ultragraphics, Inc.,* 754 F.2d 467, 470-71 (2d Cir.1985); *Taylor v. Meirick,* 712 F.2d 1112, 1120 (7th Cir.1983). Because Eales is not in the business of selling her services as a homebuilder, defendants cannot complain about the profit award to Eales on the basis that it constitutes forbidden double damages.

## CONCLUSION

The judgment of the district court is AFFIRMED.

**5.** *May v. Watt,* 822 F.2d 896 (9th Cir.1987), is not inconsistent. In that case we refused to award indirect profits because the plaintiff had been unable to provide an ascertainable figure for them. *Id.* at 901.

**6.** For the same reason we do not discuss whether it would have been appropriate for the district judge to award only those profits directly attributable to the use of the plans. *See Frank II,* 886 F.2d at 1550. As Shotey and Environmental Lifestyles conceded at oral argument, the district judge was not obliged in any event to trace the degree to which the plans contributed to total profits in the absence of any offer of proof on the issue by the defendants.