Douglas A. JOHNSON d/b/a Douglas Johnson & Associates, and Professional Management Co., Plaintiffs,

v.

Theresa C. JONES, Daniel A. Tosch, Progressive Associates, Inc., John C. Uznis and Uznis Deneweth Co., individually, jointly and severally, Defendants.

No. 94–CV–70497–DT.

United States District Court,
E.D. Michigan,
Southern Division.

March 29, 1996.

■■■■■■■■■■■■■■■■

Douglas P. Lalone, Troy, MI, for plaintiffs.

Carl F. Jarboe, Detroit, MI, for Defendants Jones, Uznis and Uznis Deneweth Co.

Richard Smith, Detroit, MI, for Defendants Tosch and Progressive Associates.

## OPINION AND ORDER SETTING FORTH THE COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

ROSEN, District Judge.

### I. INTRODUCTION

This copyright infringement/breach of contract action was tried by the Court without a jury May 15–22, 1995. In his Amended Complaint, Plaintiff Douglas Johnson, an architect, alleges that Theresa Jones, the owner of a home located at 1100 Orchard Ridge Road in Bloomfield Hills, Michigan, breached a contract she had entered into with him to design and remodel her home. Johnson also alleges that, without his authorization, Mrs. Jones, Daniel Tosch, another architect, and John C. Uznis, a builder, copied and used his copyrighted architectural drawings and information contained in his copyrighted architectural proposal package in violation of the federal Copyright Act, 17 U.S.C. § 101, *et seq.* He further alleges that the Defendants copied his drawings, removed his name from them and replaced it with Mr. Tosch's company name, in violation of the Lanham Act, 15 U.S.C. § 1125.[1]

During the course of the five-day bench trial, the Court heard the testimony of Plaintiff Douglas Johnson; Defendants Daniel Tosch, John C. Uznis, and Theresa Jones; and Timothy Stoepker, an attorney with Abbott, Nicholson, Quilter, Essahaki & Youngblood law firm. The Court also received into evidence numerous architectural drawings, blueprints, photographs and documents.

Having heard the testimony of the witnesses and the oral arguments of counsel, and having reviewed and considered the exhibits submitted at trial, the Court makes the following findings of fact and conclusions of law. To the extent that any findings of fact constitute conclusions of law, they are adopted as such. To the extent that any conclusions of law constitute findings of fact, they are so adopted.

### II. FINDINGS OF FACT

1. Plaintiff Douglas Johnson is a licensed architect and builder[2] whose principal place of business is located in Rochester Hills, Michigan. Mr. Johnson conducts his architectural business under the name "Douglas Johnson & Associates", and conducts building management services under the name of "Professional Management Co."

2. Defendant Daniel Tosch is also an architect licensed in the State of Michigan. He has been an architect since 1971 and is the owner of Defendant Progressive Associates, Inc., an architectural firm based in Bloomfield Hills, Michigan.

3. Defendant John C. Uznis is a licensed builder. He owns Defendant Uznis Deneweth Co., which is a building/contracting firm based in Huntington Woods, Michigan. Mr. Uznis has been a builder for more than 25 years.

4. Defendant Theresa Jones is the owner of a home located at 1100 Orchard Ridge Road in Bloomfield Hills, Michigan. Mrs. Jones is an experienced business woman who owns and operates a large automobile dealership. She also has a Ph.D. degree in nursing.

5. Mr. Johnson testified that he first met Mrs. Jones on July 3, 1993. Johnson had received a telephone call from George Bell, a real estate agent, who informed him that

---

1. On April 20, 1995, the Court entered an Opinion and Order granting partial summary judgment as to Defendants Jones, John Uznis and Uznis Deneweth Co. on Plaintiff's Lanham Act claim. Thus, the only defendants on that claim are Defendants Tosch and Progressive Associates.

2. Mr. Johnson is a licensed architect in Michigan, Arizona and Maryland and is licensed as a builder in Michigan.

Mrs. Jones was considering purchasing the Orchard Ridge house and remodeling it. (Mr. Johnson was a friend of Mr. and Mrs. Bill Fredricks who then owned the house, and Johnson had previously done some architectural drawings for renovating the structure which the Fredricks had left at the house for the real estate people to use in presenting the house for sale.) Mr. Bell asked Johnson to meet with Mrs. Jones and show her the drawings he had done for the Fredricks.

6. At this initial meeting, Johnson walked through the house with Mrs. Jones and described to her the plans that he had prepared for Mr. Fredricks. Mrs. Jones told him what she would like to do with the house and he showed her how the house could be remodeled to her specifications.

7. At this first meeting, Mrs. Jones asked what Johnson's architectural fees would be on a renovation project such as the one contemplated by her. Mr. Johnson testified that he told her his fees for architectural services would be 3½% of the total cost of construction for that type of project.

8. Mr. Johnson and Mrs. Jones had several subsequent meetings in early July. On an number of these occasions, the parties met at the Orchard Ridge house. On July 15, 1993, Johnson met with Mrs. Jones at her request at the house. Johnson brought with him to this meeting an architectural proposal and a standard AIA (i.e., American Institute of Architects) "Abbreviated Form of Agreement between Owner and Architect" which called for payment of 3½ percent of construction costs for architectural fees.

9. Article 6 of the AIA form contract which Johnson gave to Mrs. Jones was captioned "Use of Architect's Drawings, Specifications and Other Documents." Section 6.1 provided:

6.1 The Drawings, specifications and other documents prepared by the Architect for this Project are instruments of the Architect's services for use solely with respect to this Project, and *the Architect shall be deemed the author of these documents and shall retain all common law, statutory and other reserved rights, including copyright.* The Owner shall be permitted to retain copies, including reproducible copies of the Architects' Drawings, Specifications and other documents for information and reference in connection with the Owner's use and occupancy of the Project. *The Architect's Drawings, Specifications or other documents shall not be used by the Owner or others on other projects, for additions to this Project or for completion of this Project by others,* unless the Architect is adjudged to be in default under this Agreement, *except by agreement in writing and with appropriate compensation to the Architect.*

10. Johnson testified that he gave the AIA contract to Mrs. Jones for her consideration on July 15, 1993. (As of that date, Mrs. Jones had not purchased the house; she was still arranging financing. She did not close on the purchase of the house until early August.) He also gave Mrs. Johnson his Architectural Proposal Package for an addition to, and remodeling of, the Orchard Ridge house.

11. As of July 15, 1993, Johnson had not made any drawings of the property for Mrs. Jones and Mrs. Jones did not pay Johnson anything as of that date.

12. Mrs. Jones, however, wanted to get the renovations started as soon as she took over ownership of the Orchard Ridge house and made it clear that she wanted the renovations completed and to be moved into the house by December 1994. Johnson testified that following the July 15 meeting, he had a series of subsequent meetings with Mrs. Jones that were "kind of fast and furious."

13. Because Mrs. Jones was anxious to speed up the process, later in July, 1993, the real estate agent handling Mrs. Jones' purchase of the house asked Johnson for a recommendation for a surveyor to do a mortgage survey. Mr. Johnson arranged for a mortgage survey to be done by Glenn Heil. He also had Heil do a topographical survey at the same time so that they would have an accurate site plan to insure that any renovations done on the Orchard Ridge house would be in compliance with the City of Bloomfield Hills new ordinance regarding building setbacks. Johnson testified that Mrs. Jones

authorized him to hire Mr. Heil and bills for his services were sent directly to Mrs. Jones.

14. On July 25, 1993, Johnson delivered to Mrs. Jones his "Design Development Program", which contained a program outline, design-development schematics and an overall building schematic for an addition to, and remodeling of, the Orchard Ridge house. Johnson had expected to pick up a signed copy of the AIA contract at that time, but Mrs. Jones informed him that "her attorney was busy doing something else" and that she had not had time to get to the contract, either. However, Mrs. Jones did pay Johnson a "retainer" of $5,000 at that time, and Johnson testified that he believed that he was "hired" as to do the architectural work on the house as of that payment. (Johnson stated that Mrs. Jones had told him shortly after their meeting on July 15th when he gave her his architectural proposal and the AIA contract that she wanted to hire him as the architect, but that he did not believe he was actually hired until she paid him the $5,000 retainer on July 25th.) Johnson testified that he did not have any reason to believe at that time that Mrs. Jones was not going to sign the contract he had given her.

15. On August 10, 1993, Johnson again met with Mrs. Jones. He gave her at this meeting a "Preliminary Construction Budget Analysis" setting out a construction estimate of the project and a projected cashflow for the construction. He also gave Mrs. Jones some architectural drawings that he had done for the renovations.

16. At that August 10 meeting, Mrs. Jones stated that she wanted Johnson to handle the renovation as a "design/build," under which Johnson would serve not only as the architect but also as the general contractor, rather than solely as an architect. Johnson told her that he would get a copy of the AIA contract for doing a design/build and would deliver it to her. Johnson testified that as of this point in time, it was his understanding that the AIA standard architect's agreement which he had previously given to Mrs. Jones was "null and void."

17. Johnson did, in fact, deliver to Mrs. Jones an AIA "Standard Form of Agreements Between Owner and Design/Builder"

with a note asking her, "Please review this with your lawyer and note any changes."

Article I, Section 1.3 of the AIA design/build contract given to Mrs. Jones was captioned "OWNERSHIP AND USE OF DOCUMENTS". It provided in pertinent part as follows:

> 1.3.1 *The drawings, specifications and other documents furnished by the Design/Builder are instruments of service and shall not become the property of the Owner whether or not the Project for which they are made is commenced. Drawings, specifications and other documents furnished by the Design/Builder shall not be used by the Owner on other projects, additions to this Project, or . . . for completion of this Project by others, except by written agreement relating to use, liability and compensation.*

18. Mrs. Jones and Johnson again met on August 11, 1993. At that meeting, some minor changes in the drawings he had previously given her were discussed.

19. After this August 11 meeting, Johnson began working on the different floor plans for the project. Concurrently, Johnson also worked on the demolition plans and the plans for Addition A.

20. On September 4, 1993, Johnson and Mrs. Jones did a walk-through of the residence. During this walk-through, Johnson discussed with Mrs. Jones all of the items that were to be demolished and what was to be saved in the structure.

21. Johnson finished the demolition drawings on September 12, 1993. The demolition drawings, along with the Addition A drawings and the site plan prepared by surveyor Glenn Heil were submitted to the City of Bloomfield Hills for approval.

22. Johnson copyrighted the drawings and documents done by him for the Jones residence and copyright notices were placed on the drawings and documents. Johnson also registered the copyrights. The copyrighted drawings and documents are:

(1) The Jones Residence (preliminary design drawings) [PX 5, 6, and 7], Reg. No. VA 619–049, registered December 6, 1993;

(2) The Jones Residence—Not Yet Constructed (the building structure, as embodied in PX 5, 6, and 7), Reg. No. VA 638–333, registered February 7, 1994;

(3) Jones Residence Demolition Phase I and Addition A Plans [PX 8–14], Reg. No. VA 638–334, registered March 7, 1994; and

(4) Jones Residence Architectural Proposal Package [PX 15], Reg. No. TX–3–792–577, registered February 4, 1994.[3]

23. On September 22, 1993, Johnson prepared a construction schedule for the demolition. Johnson also prepared a construction estimate of itemized costs required for Addition A. The construction schedule and costs estimate were subsequently given to Mrs. Jones. The Addition A construction estimate and the demolition construction schedule were both submitted to the City with the application for a building permit.

24. Meanwhile, on September 24, 1993, Mrs. Jones asked Johnson to meet with her at her dealership. Johnson testified that it was his understanding that Mrs. Jones and he were going to sign the contract on that day. When Johnson arrived for the meeting, Mrs. Jones informed him that a lawyer from the Abbott, Nicholson firm, Timothy Stoepker, was going to join them and that he would be bringing someone else along with him who was going to be involved in the project.

25. Stoepker arrived for the meeting with Daniel Tosch. Tosch's role was represented as being Mrs. Jones' "construction agent"; that he was going to make sure that Johnson built the project properly.

26. At this September 24, 1993 meeting, Stoepker informed Johnson that they were not going to use the AIA contract he had given to Mrs. Jones; Stoepker was going to write a new contract for the project himself.

27. Notwithstanding that no contract was yet executed, Johnson was told to continue working on the project so that the approaching winter would not bring the project to a complete halt and they could complete the work in accordance with Mrs. Jones desired December 1994 completion date. Johnson

testified that at that point in time he had every confidence that Stoepker was going to write a good contract.

28. Stoepker did subsequently prepare a contract which he sent to Mrs. Jones, Mr. Johnson and Mr. Tosch on September 29, 1993. Stoepker's proposed contract included terms which would have required that any increase in construction costs caused by any changes ordered by Mrs. Jones be borne by Johnson and that reimbursement for such excess costs could only be sought by Johnson through litigation. Stoepker's proposed contract also provided, "Upon payment by the Owner to the Builder for the architectural drawings and specifications, the same shall be owned by the Owner."

29. Johnson objected to these terms and so informed Mrs. Jones. Mrs. Jones said she would contact her attorney and have him prepare another contract, but she told Johnson to continue the work on the project in the meantime.

30. Stoepker did prepare another contract and circulated it on October 20, 1993. However, the revised contract still had the same objectionable terms that Johnson would not agree to in the first contract. Johnson subsequently had his lawyer prepare an addendum setting out some proposed changes to Stoepker's proposed contract.

31. Mrs. Jones did not accept Johnson's addendum. Instead, she agreed to reconsider the AIA design/build contract previously proposed by Johnson. Johnson filled in the blanks on the standard form contract he had previously given to Mrs. Jones and gave the filled out contract form to Mrs. Jones on October 26, 1993. The contract provided for payment to Johnson of 14% of the cost of construction.

32. On Friday, November 5, 1993, Johnson was informed by Timothy Stoepker that Mrs. Jones decided that she did not want to proceed with the AIA contract.

33. Johnson telephoned Mrs. Jones the following Monday, November 8, 1993. Mrs.

**3.** The copyrighted "Jones Residence Architectural Proposal Package" includes the Design Development Program, the Preliminary Construction Budget, the Demolition Budget, the Demolition Construction Schedule, and Estimated Costs of Construction.

Jones told him that she no longer wanted to employee Mr. Johnson to work on her house. Johnson informed her that there was a payment due for his services to that date for approximately $16,000. Mrs. Jones said she would pay him at the end of the week.

34. On November 9, 1993, Johnson received a letter from Timothy Stoepker advising him that Mrs. Jones would be proceeding with another builder and architect for the Orchard Ridge renovation. In that letter, Stoepker asked Johnson to contact his office if it was his desire to sell the drawings he had done for the project. Johnson had no desire to sell the drawings.

35. On November 12, 1993, Johnson hand-delivered to Mrs. Jones an invoice for $19,966.98 for unpaid architectural services as of the date of his discharge. Mr. Stoepker subsequently advised Mr. Johnson that they were not interested in buying his drawings, that there was never any contract for his services and therefore, Mrs. Jones did not owe him anything. Then, on November 29, 1993, Stoepker sent a letter to Mr. Johnson offering to pay him $3,500 "for purposes of settlement only (liability being denied)."

36. Johnson did not accept that offer and he testified that he did not do anything further on the Jones job.

37. Theresa Jones' testimony concerning her relationship with Johnson from July through November 1993 and his work on the project during that time period corroborated Mr. Johnson's testimony.

38. Mrs. Jones further testified that she knew she owed Johnson for the work he had done and that she had fully intended to pay Johnson the $19,966.98 stated in his November 12, 1993 invoice, but she did not pay Johnson anything because her lawyer had told her not to do so.

39. Daniel Tosch replaced Johnson as the architect on the Jones residence project in November 1993. He testified that he was actually hired by John Uznis who had been hired as the contractor for the project after Johnson was discharged.

40. Tosch testified that he actually first became involved with the Jones project in September 1993 when he was asked by John Youngblood, an attorney with the Abbott, Nicholson firm, if he would be willing to monitor the construction of the Jones residence. He met with Mrs. Jones and Timothy Stoepker to discuss the type of monitoring work that he was being asked to do. However, he never entered into a monitoring contract for the project and did not do any monitoring work for Mrs. Jones.

41. Then, in early November 1993, Tosch received a telephone call from John Uznis. He said that Mr. Uznis informed him that Mr. Johnson was no longer going to be involved in the project and that Uznis was going to be the builder. Uznis asked Tosch to act as the architect on the project. Tosch said that Uznis was a friend of his and that the two men had a close working relationship. He stated that he had previously worked with Uznis on ten to twenty other projects.

42. Mr. Uznis testified that his attorney was John Youngblood, and as with Tosch, it was Youngblood who got him involved in the Jones project. Uznis testified that he began working on the project November 2nd or 3rd and that he and Mrs. Jones entered into a formal written contract for his services as builder a week later, on November 9, 1993. The contract called for payment to Uznis of 15% of the total construction costs.

43. Shortly after Uznis and Tosch's initial telephone conversation concerning the Jones project, Tosch and Uznis met with Mrs. Jones. Mrs. Jones gave them a set of the drawings and plans that had been prepared by Douglas Johnson. Mrs. Jones told the two men that she was relatively happy with the plan developed by Johnson and wanted to proceed with that design.

44. Tosch testified that the name of the architect, Douglas Johnson and Associates, and a copyright notice were on the drawings that Mrs. Jones gave them.

45. A day or two later, Tosch and Uznis met at the job site to look it over. Tosch said that he told Uznis that the copyright issue had to be resolved before they actually started any work.

46. Uznis and Tosch then discussed how they were going to proceed with the project. According to Tosch, Uznis told him that he had not done any work in the City of Bloomfield Hills before and asked him if he knew anyone in the City who could advise them as to what had already been submitted for the Jones project, what they had to do to get a building permit, and how long it would take. Tosch said that he knew the City officials and said that he would go to the City to determine what had to be done.

47. Tosch testified that he met with John Hudock, the City's building official a day or two later. When he inquired about the status of anything submitted concerning the Jones residence, Hudock said he had the drawings and plans which had been submitted by Johnson in his office. He produced the site plans, drawings for Addition A and the demolition drawings. Hudock said that the drawings and plans had been reviewed by the City and he was just waiting for someone to come in and pay the fee for the building permit and the building permit could then be issued.

48. However, when Tosch informed Hudock that the previous architect and builder was no longer involved in the project, Hudock informed him that the approvals that had been granted on the drawings were no longer valid. Hudock then crossed off the approval stamp and gave Tosch the drawings. According to Tosch, when he then asked Hudock what would have to be done to get a construction permit, Hudock told him that if he were to submit drawings that were substantially the same as the drawings that had been reviewed and approved, then their plans would not have to go back to the city engineer for approval and the review process would be reduced to a minimum. Tosch testified that he understood from his conversation with Mr. Hudock that if he were to resubmit the same drawings that Johnson had done, the project would be approved expeditiously.

49. According to Tosch, when he got back to his office he called Uznis and told him what the Bloomfield Hills official had said. He said that he then again brought up the issue of Johnson's copyrights of the draw-

ings. Tosch testified that Uznis said he would call Mr. Stoepker to find out how they should proceed with respect to the copyright matter. Although both Tosch and Uznis had their own attorneys who handled legal matters pertaining to their respective businesses, neither Tosch nor Uznis contacted their own attorneys.

50. Tosch stated that he subsequently received a phone call from Mr. Stoepker indicating that he would review the copyright issue and would get back with Tosch and Uznis. A day or two later, Tosch got a telephone call from Mr. Uznis who said he had talked with Mr. Stoepker, that Stoepker told him he did not think there would be a problem if they were to use Johnson's drawings, and that they would be getting written confirmation to that effect.

51. Tosch testified that he then traced Johnson's floor plans, foundation plans and elevation drawings. He also testified that he took the drawings that he had gotten from the City, removed Johnson's name and seal from the Addition A and demolition drawings and Glen Heil's seal from the site plan and replaced Johnson's name and seal and Heil's seal with his own business logo and seal. He then gave the drawings to Mr. Uznis who submitted them to the City on November 22, 1993. The drawings were approved the same day. Tosch testified that Uznis picked up the approved plans from the City and they used those plans to commence demolition and construction.

52. John Uznis admitted that he knew that the plans and drawings submitted by Tosch were the plans and drawings done by Douglas Johnson. He said he did not direct Tosch to prepare new plans because of the time constraints—it was November and he wanted to do the demolition work before the holidays and weather became factors.

53. Both Mr. Tosch and Mr. Uznis testified that modifications and changes were made on the project during the course of construction that were not incorporated in Johnson's drawings and plans. The Court finds, however, that the changes made were essentially cosmetic changes; Tosch's and Uznis's plans and the design of the ultimate

structure that was built did not deviate substantially from the drawings made by Mr. Johnson.

54. Uznis also testified that Johnson's notes, budgets, and cost estimates contained in Johnson's "Architectural Proposal Package" were not used by him in building the Jones residence and the Court credits Uznis' testimony concerning this matter. Nothing of record contradicts Uznis' testimony on this issue.

55. During the trial, the Court also heard the testimony of attorney Timothy Stoepker. Mr. Stoepker sent Mrs. Jones a letter in which he opined that Mrs. Jones was a "co-owner" of Johnson's copyrighted drawings, and, therefore, her "use" of the drawings did not constitute copyright infringement. However, Stoepker admitted that he has no expertise in copyright law and did not do any research on the issue in connection with his letter. He testified that he assigned the research task to an associate. The associate did not have any expertise in copyright law, either. Stoepker further admitted that he never looked at any of Johnson's drawings or other copyrighted documents.

56. Copies of Stoepker's letter were also sent to Messrs. Tosch and Uznis. Tosch and Uznis testified that they never consulted their own attorneys about the effect of Johnson's copyrights.

57. Although Douglas Johnson was never paid the $19,966.98 balance still owed by Mrs. Jones pursuant to the bill for services Johnson sent her in early November 1993, Johnson did not take any action to collect the amount due until after his visit to the Orchard Ridge job site in January 1994.

58. Johnson testified that in the middle of January 1994, he happened to be driving on Orchard Ridge Road and decided to stop at the Jones residence and see how the project was progressing. Contractors from a heating company were working on the job at the time. A construction table for plans was set up in front of the house. On the table, Johnson found the plans he had drawn spread out. Johnson had a camera in his car. He got his camera and photographed the table with his plans on it. A few weeks later, Johnson initiated this lawsuit.

59. John Uznis testified that construction on the Orchard Ridge house was substantially completed in November 1994.

60. The total cost of construction on the project was $1,550,000. Uznis testified that, pursuant to his contract with Mrs. Jones, his fee was 15% of the total cost of construction, which amounted to $232,500. He further testified that his profit margin on the job was between 6.5 and 6.75%, i.e., somewhere between $100,750 and $104,625.

61. Daniel Tosch testified that he was paid $16,560 for his work on the Jones residence. Tosch further testified that he does an average of 40 to 50 jobs per year and his gross earnings for fiscal year 1994 was approximately $1,000,000. He stated that his overall profit margin for the total of all jobs in 1994 was approximately 15%. By application of the figures testified to, Tosch's profit on the Jones project would have amounted to approximately $2,500.

## III. CONCLUSIONS OF LAW

1. Plaintiff Douglas Johnson has brought this action alleging copyright infringement under 17 U.S.C. § 501 against all of the named Defendants; unfair competition or misrepresentation as to source under 15 U.S.C. § 1125 against Defendants Daniel Tosch and his firm, Progressive Associates, Inc.; and breach of contract or unjust enrichment against Defendant Theresa Jones for failure pay Johnson for the services he rendered.

### A. COPYRIGHT INFRINGEMENT

2. Plaintiff has alleged a claim of copyright infringement against all of the named Defendants for infringement of his four registered copyrights pertaining to the Jones Residence, to-wit,

(1) The Jones Residence (preliminary design drawings) [PX 5, 6, and 7], Reg. No. VA 619–049, registered December 6, 1993;

(2) The Jones Residence—Not Yet Constructed (the building structure, as embodied in PX 5, 6, and 7), Reg. No. VA 638–333, registered February 7, 1994;

(3) Jones Residence Demolition Phase I and Addition A Plans [PX 8–14], Reg. No. VA 638–334, registered March 7, 1994; and

(4) Jones Residence Architectural Proposal Package [PX 15], Reg. No. TX–3–792–577, registered February 4, 1994.

3. Original architectural works are subject to copyright protection. 17 U.S.C. §§ 102(a)(5) and (8). The Copyright Act defines an architectural work as "the design of a building as embodied in any tangible medium of expression including a building, architectural plans, or drawings. The work includes the overall form as well as the arrangement and composition of spaces and elements in the design, but does not include individual standard features." 17 U.S.C. § 101.

■ 4. Copyright infringement is established by showing that (a) the plaintiff owns a valid copyright, and (b) the copyrighted work has been infringed. *Robert R. Jones Assoc., Inc. v. Nino Homes*, 858 F.2d 274, 276 (6th Cir.1988).

■ 5. Plaintiff has introduced into evidence copies of copyright registration certificates for the drawings and documents at issue. Such certificates create the presumption of copyright validity and ownership. *Ronald Mayotte & Associates v. MGC Bldg. Co.*, 885 F.Supp. 148, 152 (E.D.Mich.1994). Defendants have not disputed the validity of Plaintiff Johnson's copyright registration certificates.

■ 6. A showing that a defendant copied the plaintiff's protected material establishes copyright infringement. *Nino Homes, supra.* Copying may be proven by direct or circumstantial evidence. *Hartman v. Hallmark Cards, Inc.*, 833 F.2d 117, 120 (8th Cir.1987).

■ 7. Proving copying by circumstantial evidence requires a showing (1) that the defendant had access to the protected material and (2) that the defendant's work is substantially similar to the protected work establishes copying. *Nino Homes, supra*, 858 F.2d at 276–78.

■ 8. Whether a defendant's work is "substantially similar" to a protected work depends upon whether an ordinary observer would conclude that the defendant's work was taken from the copyrighted source. *Robert R. Jones Assoc., Inc. v. Nino Homes*, 686 F.Supp. 160 (E.D.Mich.1987), *aff'd*, 858 F.2d 274 (6th Cir.1988). This test focuses on the overall similarities, rather than the minute differences between the two works; exact reproduction or near identity is not necessary to establish infringement. *Atari, Inc. v. North. Am. Philips Consumer Elec. Corp.*, 672 F.2d 607, 618 (7th Cir.), *cert. denied*, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982). As the court explained in *CSM Investors, Inc. v. Everest Development, Ltd.*, 840 F.Supp. 1304 (D.Minn.1994),

> It is the presence of substantial similarities . . . rather than differences which determines whether infringement exists. "The existence of differences will not negate infringement unless they so outweigh similarities that the similarities can only be deemed inconsequential within the total context of [the copyrighted] work."

*Id.* at 1312 (citation omitted).

■ 9. In this case, the Court finds that Plaintiff has established copyright infringement of his architectural drawings by both direct and circumstantial evidence of infringement.

10. Defendant Tosch admitted that he copied, Plaintiff's copyrighted preliminary design drawings by tracing them. Tosch further admitted that he removed Plaintiff's name and seal from drawings and replaced the name and seal with his own. Tosch and Uznis further admitted that they used Plaintiff's drawings and the copies of drawings that Tosch made to obtain the City's approval and the building permit. This direct evidence of copying clearly establishes infringement of Plaintiff's copyrighted drawings.

11. Defendants attempted during trial to demonstrate that they did not "use" Plaintiff's design drawings in doing the actual renovations and construction of the Jones Residence. However, it is undisputed that all of the Defendants had access to Johnson's drawings and plans, and a comparison of Johnson's drawings with plans they used in the construction of the Jones Residence

clearly reveal infringing substantial similarities. Moreover, Plaintiff Johnson found his plans being used on the job site in January 1994. Therefore, the Court finds Tosch and Uznis to have directly infringed Plaintiff's copyrighted drawings.

12. The Court further finds that such infringement was willfully done.

13. With respect to Defendant Theresa Jones, the Court does not find Mrs. Jones liable for infringement, either directly or contributorily. She did not participate in the infringement nor did she "induce, cause or materially contribute to the infringement." *Nimmer on Copyright* § 12.4[A]. She did nothing more than give copies of the drawings she had received from Mr. Johnson to Messrs. Tosch and Uznis. She told them she liked Johnson's design and wanted to stay with the general idea of his design. She did not tell Tosch or Uznis to copy Johnson's plans. Moreover, the Court finds that it was reasonable for Mrs. Jones to rely upon the opinion of her attorney, Timothy Stoepker, that she would not be liable for infringement of Mr. Johnson's copyright because, in his opinion, she was a co-owner of the drawings.

14. Although Defendants Tosch and Uznis testified that they received copies of Mr. Stoepker's letter to Mrs. Jones, the Court finds it wholly unreasonable for the two men, with more than 25 years experience in architecture and construction not to seek the advice of their own attorneys and to have believed that it was entirely proper for them to deliberately copy another architect's work and portray it as their own.

15. Defendants have argued that they should not be found liable for infringement because they contend that Mrs. Jones had been granted an implied non-exclusive license to use Johnson's drawings by virtue of her having paid Johnson $10,000. While it is true that a non-exclusive license to use copyrighted material may be implied from the parties' conduct, 3 Nimmer on Copyright § 10.03[A], at 10–38 (1994), a determination of whether the parties' conduct created an implied license requires an examination of the intent of the parties.

16. The evidence at trial clearly establishes that Mr. Johnson had made it clear that it was never his intent that Mrs. Jones be granted the unfettered right to use his copyrighted drawings and documents. The language of the two contracts he had given to Mrs. Jones to consider makes that clear. While Defendants argue that Plaintiff gave her copies of the drawings, the Copyright Act, itself makes it clear that giving copies of copyrighted material to another does not of itself convey the right to *use* the copyrighted work. ("Transfer of ownership in any material object . . . in which the work is fixed does not of itself convey any rights in the copyrighted work." 17 U.S.C. § 202.)

17. Further, with respect to Defendants' argument that Mrs. Jones paid for the use of the drawings by paying Johnson $10,000, the Court credits Mr. Johnson's testimony that the two $5,000 payments were paid (1) as a retainer and (2) as a progress payment. No testimony of record negates Mr. Johnson's testimony and his proposed contract language that it was never his intent to convey to Mrs. Jones a license to use his drawings. In sum, the Court finds no license was granted to any of the Defendants to use Plaintiff's copyrighted drawings so as to nullify the Court's finding of copyright infringement.

18. With respect to Johnson's "Architectural Proposal Package," however, the Court finds no evidence of infringement. While it is true that the Defendants had access to Johnson's Proposal Package (a copy of the Package had been given to Theresa Jones and had also been submitted to the City by Johnson with his application for a building permit), there is no evidence to establish that the Proposal was copied or used by the Defendants, and the Court, therefore, finds that Johnson's copyright on the package was not infringed by any of the Defendants.

## B. COPYRIGHT INFRINGEMENT DAMAGES

19. At the close of proofs, Plaintiff indicated that were seeking "statutory damages" and attorneys fees for willful infringement under 17 U.S.C. §§ 504(c) and 505 for infringement of his copyright on the Jones Residence preliminary architectural draw-

ings, and actual damages pursuant to § 504(b) for infringement of his other copyrights.

Section 504(c) provides in pertinent part as follows:

(1) Except as provided by clause (2) of this subsection, the copyright owner may elect, at any time before final judgment is rendered, to recover instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally, in a sum of not less than $500 or more than $20,000 as the court considers just. For the purposes of this subsection, all the parts of a compilation or derivative work constitute one work.

(2) In a case where the copyright owner sustains the burden of proving, and the court finds, that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $100,000. In a case where the infringer sustains the burden of proving, and the court finds, that such infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright, the court in its discretion may reduce the award of statutory damages to a sum of not less than $200.

17 U.S.C. § 504(c).

Section 505 of the Act provides for awards of costs and fees:

In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party other than the United States of an officer thereof. Except as otherwise provided by this title, the court may also award a reasonable attorney's fee to the prevailing party as part of the costs.

17 U.S.C. § 505.

Section 412 of the Copyright Act provides, in pertinent part:

In any action under this title ... no award of statutory damages or of attorney's fees, as provided in sections 504 and 505, shall be made for

(1) any infringement of copyright in an unpublished work commenced before the effective date of its registration; or

(2) any infringement of copyright commenced after first publication of the work and before the effective date of its registration unless such registration is made within three months after the first publication of the work.

17 U.S.C. § 412.

20. The earliest registered copyright obtained by Plaintiff is his copyright of the Jones Residence preliminary "architectural drawings", Copyright Reg. No. VA 619–049, registered December 6, 1993. (The effective dates of registration of Plaintiff's other copyrights are February 4, February 7 and March 7, 1994.)

21. The evidence presented at trial, however, establishes that infringement of Plaintiff's copyrighted drawings, was begun in mid-November 1993, before the copyright of the preliminary drawings was registered. Although Section 412(2) provides a three-month window period if registration is made within three months of the first "publication" of the work, neither the filing of plans with a city building official for the purpose of obtaining a building permit nor distribution of copies of plans to subcontractors and suppliers constitutes "publication" within the meaning of Section 412. *See Aitken, Hazen, Hoffman, Miller, P.C. v. Empire Construction Company,* 542 F.Supp. 252 (D.C.Neb. 1982), and cases cited therein. Therefore, Plaintiff's December 6, 1993 copyright is not covered by subsection (2) of § 412. Being an unpublished work and because Defendants commenced their infringement of Plaintiff's copyright in the architectural drawings before December 6, 1993, the effective date of Plaintiff's registration of copyright, subsection (1) of § 412 prohibits an award of statutory damages and attorneys' fees.

22. Therefore, the Court will award damages for Defendants' Tosch's and Uznis' infringement pursuant to 17 U.S.C. § 504(b).

Section 504(b) provides:

Actual Damages and Profits—The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

■ 22. Plaintiff Johnson claims actual damages amounting to 14% of the total cost of construction of the Jones Residence. The evidence presented at trial establishes that the total cost of construction of the Jones Residence amounted to $1,550,000, thus, Plaintiff's claimed "actual damages" amount to $217,000. Plaintiff bases his actual damage figure on the 14% figure he had indicated in the proposed design/build contract he presented to Mrs. Jones. However, the Court finds Plaintiff's claim to be wholly speculative.

23. The evidence at trial established that Mrs. Jones never entered into the design/build contract with Mr. Johnson. In fact, she flatly rejected that agreement and then informed Mr. Johnson that she was not going to use his services at all and that any relationship they had had to that point was terminated. Plaintiff would have the Court believe that Mrs. Johnson would have continued with Mr. Johnson if Messrs. Tosch and Uznis were not available, however, there is no evidence of record to establish that fact.

■ 24. However, evidence was presented at trial as to the profits Defendants Tosch and Uznis made from the Jones Residence project.

■ 25. The profits of Uznis Deneweth, John Uznis's company, and Progressive Associates, Daniel Tosch's company, from the Jones Residence project totaled $107,125. The Court finds that these profits were substantially attributable to Daniel Tosch's and John Uznis's infringement of Johnson's copyrighted drawings and plans. A copyright owner is entitled to recover any profits of the infringers that are attributable to the infringement so long as the profits are not duplicative of the copyright owner's actual damages. *Robert R. Jones Associates, Inc. v. Nino Homes, supra,* 858 F.2d at 281.

26. Based on the foregoing, the Court finds Defendants Daniel Tosch, Progressive Associates, John C. Uznis, and Uznis Deneweth Co. jointly and severally liable to Plaintiff for damages of $107,125 for copyright infringement.

## C. BREACH OF CONTRACT/UNJUST ENRICHMENT

27. Plaintiff also alleged a claim of breach of contract and/or unjust enrichment for work done for Defendant Theresa Jones for which Plaintiff was never paid.

28. At the close of proofs, Plaintiff's counsel conceded that, in light of the evidence that no contract was ever entered into between Mrs. Jones and Mr. Johnson, Plaintiff did not have a breach of contract claim. However, Plaintiff continues to seek damages for unjust enrichment under a theory of *quantum meruit,* the value of services rendered.

■ 29. Where there is no express contract, a contract may be implied in fact, where one engages or accepts beneficial services of another for which compensation is customarily made and naturally anticipated. *Comber Tool and Mold Engineering, Inc. v. General Motors Corp.,* 853 F.Supp. 238, 241–42 (E.D.Mich.1994). In such cases, the law implies an understanding or intent to pay the value of the services rendered. *Id.* at 242. The party who rendered the services is entitled to "quantum meruit" recovery, whereby the benefitted party is required to pay the reasonable value of services rendered. *Id.*

■ 25. The evidence presented at trial was that Plaintiff was owed $19,966.98 for work done for Mrs. Jones prior to her termination of his services in November 1993. Mrs. Jones testified at trial that she knew that she owed Mr. Johnson that amount and she had had every intention of paying him (but for the intercession of her attorney).

26. The Court finds that $19,966.98 represents the reasonable value of Johnson's services for which he did not receive payment from Mrs. Jones. Therefore, the Court finds that Defendant Theresa Johnson is liable to Plaintiff for this amount as *quantum meruit* damages.

### D. LANHAM ACT CLAIM

27. Plaintiff also seeks damages from Defendants Tosch and Progressive Associates for violation of Section 1125(a) of the Lanham Act, 15 U.S.C. § 1125(a) which provides, in pertinent part:

(1) Any person who, on or in connection with any goods or services, or uses in commerce any word, term, name, symbol, or device or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ...

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).

2. Plaintiff's Lanham Act claim is for false designation of origin. The test for establishing a "false designation of origin" claim is "likelihood of confusion" caused by the defendant's actions. *AT & T Co. v. Winback and Conserve Program, Inc.*, 42 F.3d 1421 (3d Cir.1994).

3. In this case, Defendant Tosch has admitted that he removed Plaintiff's name and seal from the drawings that had been submitted to the City building official and he replaced Plaintiff's name and seal with his own company name and seal. Unquestionably, such actions satisfy the "likelihood of confusion" test, and therefore, the Court finds that Defendant Tosch violated Section 1125(a).

4. Section 1117(a) of the Act provides the remedies for a violation of § 1125(a) which states, in pertinent part:

When a violation ... under section 1125(a) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by plaintiff, and (3) costs of the action.... If the court shall find that the amount of recover based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.

15 U.S.C. § 1117(a).

5. The trial court's primary function in fashioning a remedy for violation of § 1125(a) "should center on making any violations of the Lanham Act unprofitable for the infringing party." *Sands, Taylor & Wood v. Quaker Oats Co.*, 34 F.3d 1340, 1348 (7th Cir.1994), quoting, *Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117 (9th Cir.), *cert. denied*, 391 U.S. 966, 88 S.Ct. 2037, 20 L.Ed.2d 879 (1968). Thus, disgorging Defendant Tosch of his profits for the Lanham Act violation would be proper.

6. However, as the statute makes clear, any award of damages for violation of § 1125(a) is "subject to the principles of equity." Because the Court has already determined that Defendant Tosch shall be held jointly and severally liable along with Defendant Uznis for $107,125 for copyright infringement, which amount includes Defendant Tosch's profits attributable to the Jones Residence project, the Court finds that it would be inequitable to order a disgorgement of profits for violation of the Lanham Act because such an order would effectively amount to a "double recovery" for Plaintiff. However, because the Court finds that Defendant Tosch's conduct in removing Plaintiff's name and seal and replacing it with his

own was deliberate, willful and unconscionable, and because the courts have required that the remedy imposed under Section 1117(a) "provide a sufficient determent to ensure that the guilty party will not return to [his] former ways", *Sands, Taylor & Wood, supra,* the Court determines that is the type of "exceptional case" entitling Plaintiff to recover from the Tosch Defendants his costs and attorney fees. *See, Hairline Creations, Inc. v. Kefalas,* 664 F.2d 652 (7th Cir.1981).

### CONCLUSION

For all of the foregoing reasons, the Court finds for Plaintiff Douglas A. Johnson and against Defendants, and orders as follows:

IT IS HEREBY ORDERED that Defendants John C. Uznis, Uznis Deneweth Co., Daniel Tosch, and Progressive Associates shall pay to Plaintiff $107,125.00 as damages for copyright infringement.

IT IS FURTHER ORDERED that Plaintiff shall recover *quantum meruit* damages for unjust enrichment from Defendant Theresa Jones the amount of $19,966.98

IT IS HEREBY ORDERED that, pursuant to 15 U.S.C. § 1117(a), Defendant Daniel Tosch and Progressive Associates shall reimburse Plaintiff his reasonable attorneys fees and costs. Plaintiff shall file with the Court and serve upon the Defendants a verified affidavit of fees and a bill of costs within 10 days of the date of this Opinion and Order.