THE YANKEE CANDLE COMPANY,
INC., Plaintiff,

v.

NEW ENGLAND CANDLE COMPANY,
INC., Henry Komosa, and Kristine
Komosa, Defendants.

No. Civ.A. 96–30165–FHF.

United States District Court,
D. Massachusetts.

July 21, 1998.

Mary R. Bonzagni, Law Offices of Donald S. Holland, Longmeadow, MA, Donald S. Holland, Holland & Bonzagni, P.C., Longmeadow, MA, for Plaintiff.

Evan T. Lawson, J. Mark Dickison, Lawson & Weitzen, Boston, MA, Karen G. Jackson, Northampton, MA, for Defendants.

*MEMORANDUM AND ORDER*

FREEDMAN, Senior District Judge.

## I. INTRODUCTION

This dispute lit up when the plaintiff, The Yankee Candle Company, Inc. ("Yankee"), noticed that the defendants, New England Candle Company, Inc., and its owners Henry and Kristine Komosa (hereinafter collectively referred to as "New England"), had opened a retail candle store that possessed strikingly similar characteristics to its own stores. Yankee turned directly to this Court with a seven-count complaint alleging federal and state trademark infringement, federal copyright infringement, and state deceptive trade practices against New England.

After extensive hearings, the Court granted Yankee's motion for a preliminary injunction on the copyright infringement claim. Despite some initial difficulty, New England complied with the terms of the Court's order by making structural changes to its store. Seeking a permanent injunction, Yankee now moves for summary judgment only on the copyright claim. In response, New England seeks summary judgment on all claims and a dissolution of the preliminary injunction.

## II. FACTS

The facts remain essentially as set out in the Court's June 26, 1997 Memorandum and Order, with one interesting twist. As a result, the Court need not wax eloquent about the complete chronicle of this litigation, but instead will summarize those facts particularly pertinent to the present polemic.

Founded in bucolic western Massachusetts a quarter century ago, Yankee manufactures and sells candles and related products in its numerous retail stores throughout the northeastern and midwestern United States. During a recent expansion of stores situated in shopping malls, Yankee engaged architect John Wood Kuhn ("Kuhn") to design an archetypal colonial candle shop whose look Yankee could replicate. In crafting the Natick Mall store that opened in October 1994 in Natick, Massachusetts, Kuhn combined several common design elements, including dark, wooden display cases lining the interior walls, multi-paned glass windows framed by dark wood on the exterior storefront, and a brass letter sign placed above French doors in a recessed entrance. Yankee and Kuhn patterned its subsequent shopping mall stores after the Natick store's composition of elements.

The shop at the heart of this dispute, the Holyoke Mall store in Holyoke, Massachusetts, opened in October 1995. Prior to the opening, Yankee acquired ownership interest

in the architectural blueprints for the Holyoke store from Kuhn and his architectural firm. On September 4, 1996, Yankee registered those blueprints with the United States Copyright Office as a "Technical drawing." Well after the commencement of this litigation, on February 2, 1998, Yankee also registered the "Yankee Candle at Holyoke Mall" store with the U.S. Copyright Office as an "Architectural work," describing it as the "Design of a Building as Embodied in Architectural Plans."

Around the time Yankee debuted its Holyoke store, the defendants Henry and Kristine Komosa hatched a plan to compete with Yankee in the retail candle business. In due time, the Komosas incorporated the New England Candle Company, Inc. and planned to open a colonial style candle store at the Enfield Square Mall in Enfield, Connecticut. The New England store opened on September 4, 1996, looking remarkably similar to its Yankee competitor just north of the Massachusetts border in Holyoke. In fact, the New England store employed many of the same design elements the Yankee's Holyoke store used.

None too happy with these resemblances, Yankee filed suit on September 9, 1996, seeking to enjoin New England from copying the look of its store. The Court found the plaintiff likely to succeed on the merits of its copyright claim, but not its trademark infringement claims. Accordingly, the Court issued an injunction ordering New England to make various structural changes to its Enfield Mall store and to refrain from constructing another retail candle shop that looked similar to Yankee's Holyoke store. New England complied with the injunction, but now rejects the merits of Yankee's copyright and trademark allegations and seeks summary judgment.

### III. STANDARD OF REVIEW

The essential purpose of summary judgment is "to pierce the boilerplate of the pleadings" and appraise the proof to determine whether a trial is necessary. *See Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 794 (1st Cir.1992), *cert. denied*, 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993).

When summary judgment is at stake, the Court must scrutinize the record in the light most favorable to the nonmoving party, "indulging all reasonable inferences in that party's favor," *Griggs–Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir.1990), yet disregarding unsupported allegations, unreasonable inferences, and conclusory speculation. *See Smith v. F.W. Morse & Co.*, 76 F.3d 413, 428 (1st Cir.1996); *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990). If no genuine issue of material fact percolates through the record and the movant is entitled to judgment as a matter of law, then summary judgment is proper because a trial would serve no useful purpose. *See* Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Wynne*, 976 F.2d at 794.

### IV. DISCUSSION

Yankee's motion for partial summary judgment seeks brevis disposition only on count seven of its complaint, an alleged violation of the federal Copyright Act of 1976. *See* 17 U.S.C. § 101 *et seq.* New England seeks summary judgment on all counts of the complaint. The Court will consider the copyright claim first as it presents a novel question of law.

### A. *Copyright Infringement*

In Count Seven of its Second Amended Complaint, Yankee alleges that New England infringed on its registered copyrights to both the architectural blueprints of the Holyoke store and the architectural work that the store itself represents. To sustain a claim of copyright infringement, Yankee has the burden of demonstrating that it owns a valid copyright in the architectural blueprints and architectural work alleged to have been copied, and that New England copied constituent elements of the blueprints that are original. *See Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991); *Grubb v. KMS Patriots, L.P.*, 88 F.3d 1, 3 (1st Cir.1996); *Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 605 (1st Cir.1988). In this case, New England contests Yankee's ownership of a valid copyright and denies

that it copied Yankee's designs. New England argues that the Holyoke store does not merit copyright protection as an architectural work and that the plaintiff has not alleged or offered evidence of infringement of its architectural plans. Yankee responds that its retail shopping mall store qualifies for copyright protection and that the substantial similarities between the stores demonstrate the copying of its protected works.

### 1. Valid Copyright Ownership

The Copyright Act grants a copyright owner exclusive rights in a copyrighted work to authorize reproduction of the work, preparation of derivative works, and public display of the work. 17 U.S.C. §§ 106–20. To establish ownership of a valid copyright, a plaintiff must prove that "the work, when viewed as a whole, is original" and satisfy the required statutory formalities. *See Saenger Org., Inc. v. Nationwide Ins. Licensing Assoc., Inc.,* 119 F.3d 55, 59 (1st Cir.1997); *see also Motta v. Samuel Weiser, Inc.,* 768 F.2d 481, 484 (1st Cir.) (noting that the "determination of ownership is a conclusion of law based on underlying facts"), *cert. denied,* 474 U.S. 1033, 106 S.Ct. 596, 88 L.Ed.2d 575 (1985). A work need only exhibit a "minimal degree of creativity" to qualify for copyright protection. *Feist,* 499 U.S. at 345, 111 S.Ct. 1282; *see Eales v. Environmental Lifestyles, Inc.,* 958 F.2d 876, 880 (9th Cir.) (architect's plans for home constituted protectable expression of an idea rather than unprotectable idea where plans laid out location and size of numerous features), *cert. denied sub nom. Shotey v. Eales,* 506 U.S. 1001, 113 S.Ct. 605, 121 L.Ed.2d 541 (1992).

■ Among the statutory formalities, the Copyright Act requires registration of a work before a plaintiff may file suit. 17 U.S.C. § 411(a). The Copyright Office, after accepting an application, fee, and deposit of a representative copy of the work, *see* 17 U.S.C. § 408, issues a certificate of registration, which is admissible in an infringement action as "prima facie evidence of the validity of the copyright and of the facts stated in the certificate," 17 U.S.C. § 410(c). " 'In judicial proceedings, a certificate of copyright registration constitutes prima facie evidence of copyrightability and shifts the burden to the defendant to demonstrate why the copyright is not valid.' " *Lotus Dev. Corp. v. Borland Int'l, Inc.,* 49 F.3d 807, 813 (1st Cir.1995) (quoting *Bibbero Sys., Inc. v. Colwell Sys., Inc.,* 893 F.2d 1104, 1106 (9th Cir.1990)), *aff'd by an equally divided court,* 516 U.S. 233, 116 S.Ct. 804, 133 L.Ed.2d 610 (1996); *Folio Impressions, Inc. v. Byer California,* 937 F.2d 759, 763 (2d Cir.1991) (presumption of validity may be rebutted).

In this case, registration was a disputed issue, as Yankee had obtained copyright registration of the architectural blueprints of the Holyoke store on September 4, 1996 (No. VAu359–960), but did not register the Holyoke store as an architectural work until February 2, 1998 (No. VA869–582). In the interests of justice and for purposes of consideration of the entire dispute, the Court allowed the plaintiff's February 12, 1998 motion to amend its complaint dated October 28, 1996 to allege a violation of its architectural work copyright of the "Yankee Candle at Holyoke Mall." The U.S. Copyright Office had approved the plaintiff's registration of the store as an "architectural work" described as the "Design of a Building as Embodied in Architectural Plans" on February 2, 1998.

New England has devoted much of its memorandum in support of its motion for summary judgment on the copyright claim to the principle that the Holyoke store did not deserve copyright protection as an architectural work under 17 U.S.C. § 102(a)(8). To determine whether New England has sustained its burden of demonstrating the invalidity of Yankee's copyright, the Court then must examine the scope of copyright law's protection of architectural works.

### 2. Protection of Architectural Works

In passing the Copyright Act of 1976, Congress expressly indicated that architectural plans and drawings deserved copyright protection as "pictorial, graphic and sculptural works" under 17 U.S.C. § 101. *See* H.R.Rep. No. 94–1476, *reprinted in* 1976 U.S.C.C.A.N. 5659, 5668 ("An architect's plans and drawings would, of course, be protected by copyright [law]"). Congress,

however, also indicated that architectural structures built from plans possessed only minimal copyright protection:

> [T]he extent to which ... protection would extend to the structure depicted would depend on the circumstances. Purely non-functional or monumental structures would be subject to full copyright protection under the bill, and the same would be true of artistic sculpture or decorative ornamentation or embellishment added to a structure. On the other hand, where the only elements of shape in an architectural design are conceptually inseparable from the utilitarian aspects of the structure, copyright protection for the design would not be available.

*Id.*

After the passage of the 1976 Act, courts extended federal copyright protection to architectural plans, but not to buildings constructed from those plans. *See Robert R. Jones Assoc. v. Nino Homes,* 858 F.2d 274, 280 (6th Cir.1988) ("one may construct a house which is identical to a house depicted in copyrighted architectural plans, but one may not directly copy those plans and then use the infringing copy to construct the house"); *Donald Frederick Evans v. Continental Homes, Inc.,* 785 F.2d 897, 901 n. 7 (11th Cir.1986) ("A builder who constructs a home substantially similar to a dwelling already constructed is not liable for copyright infringement merely based on the substantial similarity if he or she did not engage in an unauthorized copying or use of the copyrighted architectural drawings"); *Demetriades v. Kaufmann,* 680 F.Supp. 658, 665–66 (S.D.N.Y.1988) (enjoining defendant from copying plaintiff's architectural plans or relying on infringing copies in construction, but declining to enjoin construction of defendant's substantially similar house); *see also Imperial Homes Corp. v. Lamont,* 458 F.2d 895, 899 (5th Cir.1972) (holding that copying floor plans from copyrighted brochure constitutes infringement, yet building substantially identical house not prohibited by existence of copyrighted architectural drawings for original house); *Herman Frankel Org. v. Tegman,* 367 F.Supp. 1051, 1053 (E.D.Mich.1973) ("A person cannot, by copyrighting plans,

prevent the building of a house similar to that taught by the copyrighted plans.... A person should, however, be able to prevent another from copying copyrighted house plans and using them to build the house.").

In 1990, the Architectural Works Copyright Protection Act ("AWCPA") codified the copyright prophylaxis of architectural plans and architectural works. *See* Pub.L. No. 101–650, Tit. VII, 104 Stat. 5133 (1990) (codified in scattered sections of 17 U.S.C.). The AWCPA makes an "architectural work" an "original work of authorship" eligible for copyright protection. 17 U.S.C. § 102(a)(8). The Copyright Act defines an architectural work as "the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings. The work includes the overall form as well as the arrangement and composition of spaces and elements in the design, but does not include individual standard features." 17 U.S.C. § 101.

■ With the passage of the AWCPA, a copyright owner may claim infringement of both the architectural plans and the structure based on such plans. *See* H.R.Rep. 101–735, *reprinted in* 1990 U.S.C.C.A.N. 6935, 6950 ("Either or both of these copyrights may be infringed and eligible separately for damages"). Courts have routinely protected modern architectural structures, such as commercial homes, that possess the minimal amount of originality that copyright law requires, as well as the plans from which owners built them. *See Johnson v. Jones,* 921 F.Supp. 1573, 1583 (E.D.Mich.1996) (protecting residential home as architectural work); *Richmond Homes Management v. Raintree, Inc.,* 862 F.Supp. 1517, 1523–26 (W.D.Va.1994) (finding residential home built from plans qualified as protected architectural work), *aff'd in part and rev'd in part,* 66 F.3d 316, 1995 WL 551274 (4th Cir.1995); *Value Group, Inc. v. Mendham Lake Estates, L.P.,* 800 F.Supp. 1228, 1232–35 (D.N.J. 1992) (enjoining construction of house that would infringe on developer's copyrighted single family luxury home).

This case, however, presents a different situation than a residential home. The Court cannot find, nor can plaintiff cite, a case

where copyright law protected a structure-within-a-structure similar to the candle store within a mall in this case. New England argues that Yankee's store does not deserve copyright protection because it does not constitute a "building" under 17 U.S.C. § 101.

As in any case where the Court considers certain contours of a Congressional creation, the first rule of thumb is to read statutory terms, including any provided definitions, according to their plain meaning. *See Bailey v. United States,* 516 U.S. 137, 144–45, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995); *United States v. Missouri Pac. R.R. Co.,* 278 U.S. 269, 278, 49 S.Ct. 133, 73 L.Ed. 322 (1929). When those terms are clear and unambiguous, the Court assigns them their "ordinary and natural" meaning. *Bailey,* 516 U.S. at 145, 116 S.Ct. 501. If, and only if, "the literal words of the statute create ambiguity or lead to an unreasonable result," then the Court will look to other principles of statutory construction and the underlying legislative history. *See Inmates of Suffolk County Jail v. Rouse,* 129 F.3d 649, 653–54 (1st Cir.1997) (quoting *United States v. Charles George Trucking Co.,* 823 F.2d 685, 688 (1st Cir.1987)), *cert. denied,* —— U.S. ——, 118 S.Ct. 2366, 141 L.Ed.2d 735 (1998).

The Copyright Act does not define the term "building." An oft-quoted authority on plain meaning defines a building as a "[s]tructure designed for habitation, shelter, storage, trade, manufacture, religion, business, education, and the like. A structure or edifice inclosing a space within its walls, and usually, but not necessarily, covered with a roof." Black's Law Dictionary 194–95 (6th ed.1990). Further inquiry yields a slightly different definition: "anything that is built with walls and a roof, as a house, factory, etc." Webster's New World Dictionary 185 (2d ed.1984). By these definitions, the term "building" is susceptible to numerous interpretations. A host of structures could fall within the scope of the term, as long as they have walls and a roof. The term's ambiguous nature might leave a structure like Fenway Park, one of the greatest architectural works ever designed, undeserving of copyright protection as a building without a roof over its baseball diamond (a space used for recreation, business, and, some would say, religion). *See* Raphael Winick, *Copyright Protection for Architecture After the Architectural Works Copyright Protection Act of 1990,* 41 Duke L.J. 1598, 1613 (1992) ("Golf courses, gardens, tunnels, bridges, overpasses, fences, and walls are only a few of the structures designed by architects that would not fit the common definition of 'building.' Unless courts interpreting the AWCPA contort the definition of 'building' well beyond its generally accepted limits, architects designing these other structures will not find copyright protection under the new subject matter category for architectural works.").

Surveying the AWCPA's legislative landscape, *see North Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 522, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982), adds some clarity. The House Report accompanying the AWCPA states that "the term encompassed habitable structures such as houses and office buildings. It also covers structures that are used, but not inhabited, by human beings, such as churches, pergolas, gazebos, and garden pavilions." *See* H.R.Rep. 101–735, *reprinted in* 1990 U.S.C.C.A.N. 6935, 6951. From this language, Yankee argues that its retail mall store qualifies as a copyrightable building because it constitutes a habitable three-dimensional structure and more closely resembles a "traditional or conventional building structure" than a pergola or gazebo. *See* Plaintiff's Memorandum in Opposition to Defendant's Cross Motion for Summary Judgment and Motion to Vacate the Preliminary Injunction at 8–10.

This argument misses the mark. The Court has difficulty concluding that constructing an empty room in a large shopping mall into a candle shop with a colonial motif transforms that room into a "building" within the meaning of the Copyright Act. The entire mall itself, with its interior walled off and divided into separate spaces for stores, easily qualifies as a building, but an individual store does not. Yankee did not design or construct the walls and ceiling in its store; it built within an existing structure. Had Yankee designed a church to fit into that mall space, certainly it would not become a "building" just because the AWCPA's legislative

history lists a "church" as an example of a "building." Holding that the mall store constitutes a "building" would distort the plain meaning of the term. The Court believes that protection extends to free standing structures, like Yankee's "stand alone" flagship candle store in South Deerfield, not individual units comprising a larger structure. Surely Congress did not intend for individual offices in an office building, though elaborately designed, to qualify as "buildings" themselves.

In addition to historical guidance, the Court accords deference to the interpretation of the agency charged with the statute's administration, the Copyright Office. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); 17 U.S.C. § 702. The regulations pertinent to architectural work registration provide a similar understanding of the term "building" as the statute:

> The term building means humanly habitable structures that are intended to be both permanent and stationary, such as house and office buildings, and other permanent and stationary structures designed for human occupancy, including but not limited to churches, museums, gazebos, and garden pavilions.

37 C.F.R. § 202.11(b)(2) (1997).

The regulations exclude from copyright protection "[s]tructures other than buildings, such as bridges, cloverleafs, dams, walkways, tents, recreational vehicles, mobile homes, and boats." 37 C.F.R. § 202.11(d)(1) (1997). The Court concludes that although Yankee may have intended its Holyoke store to offer a structure habitable by employees and shoppers alike, its proper characterization lies as a structure other than a building, or a structure in a building, not as a "building" in and of itself.

The Court concludes that New England has successfully rebutted the presumption of copyright validity that Yankee's registration raises. Yankee does not have a valid copyright in the Holyoke store as an architectural work. By contrast, Yankee does have a valid copyright in the architectural blueprints, which New England does not contest.

New England claims, however, that Yankee's complaint does not allege blueprint infringement, and that Yankee has offered no evidence of infringement, thereby entitling New England to summary judgment. The Court disagrees with this disingenuous contention. Construing the complaint liberally, *see McIntosh v. Antonino,* 71 F.3d 29, 35 (1st Cir.1995), both the Court and the parties focused on the issue of New England's factual copying of Yankee's blueprints during two days of preliminary injunction hearings, after which New England requested a ruling that Yankee had not proven factual copying.

### 2. *Blueprint Infringement*

To demonstrate actionable copying, Yankee must first prove that New England copied the copyrighted Holyoke store blueprints as a factual matter. Yankee has endeavored to accomplish this task with evidence that Henry Komosa, who designed New England's allegedly infringing store, had access to Yankee's blueprints and that the offending and copyrighted blueprints are so similar that the Court may infer that factual copying occurred. *See Lotus,* 49 F.3d at 813; *Concrete Mach.,* 843 F.2d at 606. Yankee must still prove that the copying of the blueprints was so extensive that it rendered the two sets of plans substantially similar. *See CMM Cable Rep, Inc. v. Ocean Coast Properties, Inc.,* 97 F.3d 1504, 1513 (1st Cir.1996); *Lotus,* 49 F.3d at 813. The Court may conclude that two works are "substantially similar" if, in the words of Judge Learned Hand, "the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same." *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.,* 274 F.2d 487, 489 (2d Cir.1960) (quoted with approval in *Concrete Mach.,* 843 F.2d at 607).

In this case, the points of similarity between the plans overwhelmingly exceed the points of dissimilarity. Nothing the defendants have presented has caused the Court to stray from the conclusion made in the Court's order granting a preliminary injunction: "[A] reasonable person observing the two stores would conclude that [New Eng-

land] had copied the design of the Holyoke store." *The Yankee Candle Co. v. New England Candle Co.*, C.A. No. 96–30165–FHF, slip op. at 11–12 (D.Mass. June 26, 1997).

■ Dissecting the plans, the Court finds that five of the six elements expressed in New England's plans remarkably resemble designs found in its competitor's blueprints. The designs for New England's storefront windows and framing, the display units depicted from the front and the side, and the overhead layout of the store, including its French doors and recessed entrance, could pass for replicas of the designs for the same elements in Yankee's Holyoke store plans. Only the "light cove detail" that illuminates the New England store's sign does not have a twin in the Yankee plans. Nevertheless, given Komosa's access to the copyrighted blueprints and the similarities between the two sets of plans, the Court concludes that copying has occurred.

Further, careful comparison of Yankee's six-page store layout designs and the New England one-page blueprint reveal striking, illuminating, and unmistakable similarities. Independent creation cannot explain away the similarity between the plans. The manner in which an architect can express the idea of a colonial era store varies immeasurably. A drive from West Stockbridge, Massachusetts to Caribou, Maine will yield as many different colonial style stores as the mind can imagine. But a reasonable observer in this case, viewing these blueprints, could only conclude that New England's design and arrangement of the elements in its store plan well surpasses coincidental resemblance to Yankee's blueprints. As a result, because of substantial similarity in the plans, the Court concludes that defendants infringed upon Yankee's valid copyright on the Holyoke Mall store blueprints.

■ Although Yankee has waived damages in this case, under copyright law, this Court may grant a final injunction on reasonable terms to prevent or restrain infringement of a copyrighted work. 17 U.S.C. § 502. To prevent the suspected infringement, the Court previously ordered New England to make physical changes to its Enfield Square Mall store. The Court now makes that preliminary injunction permanent, ordering the defendants to keep the requisite structural changes and prohibitions in place, and to refrain from constructing future stores that incorporate the same combination of interior and exterior elements that rendered its Enfield store blueprints substantially similar to Yankee's Holyoke store.

### B. *Trademark Claims*

Section 43(a) of the Lanham Act creates a civil cause of action against:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person. . . .

15 U.S.C. § 1125(a).

■ In *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992), the Supreme Court held that claims for infringement of trade dress fell under section 43(a). *Id.* at 770, 112 S.Ct. 2753. To merit protection, a plaintiff's trade dress must qualify as "inherently distinctive" or have "acquired distinctiveness through secondary meaning." *Id.* at 769, 112 S.Ct. 2753. A trade dress qualifies as inherently distinctive when its "intrinsic nature serves to identify a particular source of a product." *Id.* at 768, 112 S.Ct. 2753. Trade dress that "carries no distinctive message of origin to the consumer" does not meet this standard. *Wiley v. American Greetings Corp.*, 762 F.2d 139, 142 (1st Cir.1985). In addition, the defendant's overall look must have created a likelihood of confusion regarding its source, while the trade dress must not possess functionality. *See id.* at 769, 112 S.Ct. 2753;

*TEC Eng'g Corp. v. Budget Molders Supply, Inc.*, 82 F.3d 542, 545 (1st Cir.1996).

### 1. *Identifying Trade Dress*

■ Generally, a trade dress consists of "the design and appearance of [a] product together with the elements making up the overall image that serves to identify the product presented to the consumer." *Chrysler Corp. v. Silva*, 118 F.3d 56, 58 (1st Cir. 1997) (quoting *Fun–Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 999 (2d Cir.1997)); *see also L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1129 (Fed. Cir.) ("Trade dress is thus viewed as the overall combination and arrangement of design elements into the total image by which the product is perceived by the consuming public."), *cert. denied*, 510 U.S. 908, 114 S.Ct. 291, 126 L.Ed.2d 240 (1993).

Seeking protection of the overall look of its stores presents a special challenge for Yankee. *See Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 380 (2d Cir. 1997) ("a trade dress plaintiff seeking to protect a series or line of products faces the particularly difficult challenge of showing that the appearance of its several products is sufficiently distinct and unique to merit protection as a recognizable trade dress."). To determine whether the Lanham Act protects the plaintiff's configuration of elements into colonial candle stores, the Court must first define the plaintiff's asserted trade dress. *See Central Tools, Inc. v. Products Eng'g Corp.*, 936 F.Supp. 58, 65 (D.R.I.1996). If Yankee cannot establish that its stores have a "consistent overall look," its allegedly infringed trade dress simply "does not exist." *Walt Disney Co. v. Goodtimes Home Video Corp.*, 830 F.Supp. 762, 768 (S.D.N.Y.1993); *see also Innovative Networks, Inc. v. Satellite Airlines Ticketing Centers, Inc.*, 871 F.Supp. 709, 722 (S.D.N.Y.1995) (identifiable trade dress established by consistent overall look).

In this case, defining a trade dress reveals no easy task. Yankee makes a problematic and roundabout attempt at definition. In its complaint, Yankee asserts that its "company stores" possess a distinctive trade dress, and points to two shopping mall stores, the Holyoke and Natick stores, as prime examples of this trade dress. Amended Verified Complaint at 3. Yankee makes no distinction between its shopping mall stores and its freestanding and strip mall stores. Yankee operates 49 stores, *see* Second Amended Complaint at 3, but shopping mall stores constituted a minority of them (24), *see* Plaintiff's Motion in Opposition to Defendant's Cross Motion for Summary Judgment at 16 n. 12. Still, Yankee now argues that it seeks "to protect the building appearance or trade dress of the vast majority of its retail candle stores that are located in shopping malls." Plaintiff's Motion in Opposition at 16. Yankee contends that this trade dress of "conforming" mall stores consists of the "exterior storefront and/or store interior design elements." *Id.* Yankee's preferred list of elements derives from the design that Yankee's architect created for the company's prototypical mall store: multi-paned glass windows framed by heavy, dark wood; cherry molding; a transom panel above the store's entrance and over the windows; a gold-lettered paneled sign above the front of the store; recessed French doors with brass kickplates; dark wooden display cases with crown moldings lining the walls; wallpaper covers the space between the cases and the ceiling; and product display stands surround a cash register island.

Yankee attempts to burn the candle at both ends here, requesting protection for a trade dress that may or may not include certain elements of interior "and/or" exterior design. Considering the demonstrative evidence and the testimony of Yankee's architect, the Court concludes that Yankee's stores do not present a consistent overall look. A majority of Yankee's stores do not possess any elements that represent its "colonial style," while the company has combined the listed elements in its mall stores in a markedly inconsistent fashion. No reasonable juror could discern a consistent trade dress out of the kaleidoscopic display of photographed storefronts and interiors the parties present.

Even considering the "boxy" trade dress that Yankee endorses, *see* Plaintiff's Motion

in Opposition at 18–19, the Court concludes that it "carries no distinctive message of origin." *Wiley,* 762 F.2d at 142. However consistent, the use of dark, panelized wood for display cases and storefronts is quite generic. *See Two Pesos,* 505 U.S. at 768, 112 S.Ct. 2753 ("generic marks—those that refer to the genus of which the particular product is a species" do not merit trademark protection) (quoting *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir. 1976)); *S.S. Kresge Co. v. United Factory Outlet, Inc.,* 598 F.2d 694, 696 (1st Cir.1979). A "Yankee Candle Co." sign might be a distinctive trademark worthy of protection, but shelving and display cases along walls do not automatically harken images of a colonial candle store. Colonial architectural forms, such as the windows, doors and shelves of that period in American history, "have passed into common usage to identify" a retail shop with a colonial motif. *Boston Beer Co. Ltd. Partnership v. Slesar Bros. Brewing Co.,* 9 F.3d 175, 180 (1st Cir.1993). The arrangement of colonial forms extends well beyond candle stores.

Similarly, the defendants presented photographs of other mall stores (Victoria's Secret and Charter Club) with remarkably similar storefronts of multi-paned glass windows framed by heavy, dark wood and recessed doors. *See General Mills, Inc. v. Kellogg Co.,* 824 F.2d 622, 626–27 (8th Cir.1987) ("evidence of third party usage of similar marks on similar goods is admissible and relevant to show that the mark is relatively weak and entitled to a narrower scope of protection"). Moreover, to the extent that the panelized look might describe or suggest a candle store, the plaintiff has not attempted to prove secondary meaning.

 Further, even if the asserted trade dress could qualify for protection as distinctive, the colonial look of Yankee's mall stores is functional. Under trademark law, a product feature serves a functional purpose "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article," *Inwood Lab., Inc. v. Ives Lab., Inc.,* 456 U.S. 844, 851 n. 10, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982), or "if exclusive use of the feature would put competitors at a signif-icant non-reputation-related disadvantage," *Qualitex Co. v. Jacobson Prod. Co., Inc.,* 514 U.S. 159, 165, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995).

Granting exclusive use of generic features found in colonial era homes and buildings across New England to create the concept of a colonial shop would severely disadvantage others looking to compete in the retail industry by employing a colonial motif. The decor of basic wood shelving—a bare necessity for displaying multi-colored candles—and paneled windows is intimately related to the basic consumer demands in connection with the purchase of goods in a shop with a colonial theme. *See Prufrock Ltd., Inc. v. Lasater,* 781 F.2d 129, 134 (8th Cir.1986) (denying trade dress protection for restaurant with "down home country cooking" theme because asserted trade dress was functionally advancing concept of thematic restaurant); *The Warehouse Restaurant, Inc. v. The Customs House Restaurant, Inc.,* 217 U.S.P.Q. 411, 419 (N.D.Cal.1982) (holding that entire trade dress of East Indies customs house theme not distinctive or exclusively identified with similar restaurant with decor of boxes, barrels and freight), *appeal dismissed,* 726 F.2d 480 (9th Cir.1984); *Haagen–Dazs, Inc. v. Frusen Gladje Ltd.,* 493 F.Supp. 73, 75 (S.D.N.Y.1980) (declining to protect plaintiff's use of Scandinavian motif in marketing ice cream). This Court will not grant the plaintiff enduring monopoly control over the functional characteristics of a colonial-style shop.

Based on the previous analysis, the Court concludes that summary judgment should enter against Yankee because the plaintiff does not have a distinctive, nonfunctional trade dress. As a result, the Court grants summary judgment to the defendants on Counts I and II of the Complaint. Similarly, because Massachusetts law requires the same analysis of trademark infringement as the Lanham Act, the state claims in Yankee's Complaint do not merit separate discussion. *See Valmor Products Co. v. Standard Products Corp.,* 464 F.2d 200, 202 n. 1 (1st Cir. 1972); *Leejay, Inc. v. Bed Bath & Beyond, Inc.,* 942 F.Supp. 699, 701 n. 2 (D.Mass.1996). Accordingly, the Court grants summary

judgment in favor of the defendants on Counts III through VI.

## V. CONCLUSION

The Court need go no further. Finding that there are no genuine issues of material fact, the Court grants Yankee's motion for summary judgment on Count VII, and New England's motion for summary judgment with respect to Counts I to VI. The Court permanently enjoins New England from infringing on Yankee's copyrighted blueprints and orders it to comply with the terms of the Court's preliminary injunction. Each party to bear its own costs.

It is So Ordered.